**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PPI HOLDINGS, INC., et al.,[1] | ) | Case No. 08-_____(_____) |
| | ) | |
| Debtors. | ) | (Proposed Jointly Administered Cases) |
| | ) | |

## DECLARATION OF ROGER GOLDBAUM, CHIEF FINANCIAL OFFICER
## OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

My name is Roger Goldbaum. I am competent to testify about the following matters:

1. I am the Chief Financial Officer of each of the above-captioned debtors (collectively, the "Debtors") in these chapter 11 cases, and have served in that capacity since approximately July 2008. From May to July 2008, I served as Chief Financial Officer of MPI International, Inc., one of the Debtors. Prior to that time, I served in the capacity of Chief Financial Officer of Xstream Systems, Inc.

2. As the Debtors' Chief Financial Officer, I am responsible for the Debtors' finance, treasury, and tax functions, and I serve as an integral member of the Debtors' senior management team. I am generally familiar with the Debtors' day-to-day operations, business affairs, books, and records.

3. On the date hereof (the "Commencement Date"), the Debtors filed their voluntary petitions for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession

---

[1] The Debtors in these proceedings are: PPI Holdings, Inc.; International Fineblanking Corporation; MPI International Holdings, Inc.; MPI International, Inc.; Michigan Fineblanking, Inc.; PPI Sub-Holdings, Inc.; Precision Parts International Services Corp.; Skill Tool & Die Corp.; Skill Tool & Die Holdings Corp.

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

4.  To minimize the adverse effects of filing for bankruptcy protection on their businesses, the Debtors have requested various types of "first day" relief (such requests are collectively referred to as the "<u>First Day Motions</u>").  The First Day Motions seek relief intended to allow the Debtors to maintain their ongoing business operations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto), and believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (b) constitutes a critical element in preserving the value of the estates' assets; and (c) best serves the interests of the Debtors' estates and creditors.

5.  I submit this Declaration in support of the First Day Motions.[2]  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  I am authorized to submit this affidavit on behalf of the Debtors, and if I were called upon to testify, I could and would testify competently to the facts set forth herein.

6.  Part I of this Declaration describes the Debtors' businesses, their capital structure, and the circumstances surrounding the commencement of these chapter 11 cases.  Part II sets forth

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion.

#10312544 v9

the relevant facts in support of each First Day Motions.  A summary corporate organizational chart is attached to this Declaration as **Exhibit A**.

## PART I

### I.    SITUATIONAL OVERVIEW.

7.    The Debtors are leading designers and manufacturers in the area of fineblanking, a high-precision manufacturing process that combines principles of metal stamping and cold-forming, as well as in the area of traditional, high-precision metal stamping for a diverse customer base in a variety of end markets, including automotive (on a Tier 1, Tier 2 and Tier 3 basis), construction, agricultural, and lawn and garden.  The Debtors sell products to major North American automotive and non-automotive original equipment manufacturers (the "OEMs") and Tier 1 and Tier 2 suppliers.  The Debtors operate 6 manufacturing facilities throughout North America, including a facility in Mexico operated on the Debtors' behalf by Intermex Manufactura de Chihuahua ("Intermex") under a shelter and logistics agreement.  The Debtors also operate a sales office and corporate headquarters in Rochester Hills, Michigan.  Each manufacturing facility is strategically located near key customer facilities, enabling the Debtors to provide their products on a just-in-time basis.

8.    The Debtors' operations consist of two distinct lines of business:  MPI, which performs fineblanking work and conventional metal stamping, as well as a range of value-added finishing operations, and Skill which performs conventional metal stamping, as well as a range of assembly and value-added finishing operations.

9.    Various factors have combined to cause the Debtors to seek relief under chapter 11 of the Bankruptcy Code to preserve the value of the estates' assets.  Among other things, recent industry-wide changes in the automotive sector in which the Debtors compete, primarily in the form of lower volumes from domestic OEMs and increased competition as well as increasing

raw material prices (particularly steel), have combined to reduce the Debtors' revenues and cash flow from operations and impair their ability to service their debt. These pressures have been exacerbated by the current worldwide financial and economic crisis. The Debtors have concluded, therefore, that chapter 11 offers the best opportunity to preserve value for all constituencies.

## II. OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS.

### A. Debtors' History and Corporate Structure.

10. In September 2005, First Atlantic Capital, Ltd. ("First Atlantic"), through its investment fund Atlantic Equity Partners III, LP ("AEP"), acquired the Debtors from Morgenthaler Partners in a sponsor-to-sponsor stock transaction. As of the Commencement Date, and as set forth on <u>Exhibit A</u> hereto, the Debtors are organized as follows: PPI Holdings, Inc. is a Delaware corporation and is wholly owned by First Atlantic and certain other stockholders, none of which is a Debtor in these chapter 11 cases. PPI Sub-Holdings, Inc. is a Delaware corporation and is a wholly owned subsidiary of PPI Holdings, Inc. MPI International Holdings, Inc., Precision Parts International Services Corp. and Skill Tool & Die Holdings Corp. are Delaware corporations and are directly and wholly owned by PPI Sub-Holdings, Inc. MPI International, Inc. is a Michigan corporation and is directly and wholly owned by MPI International Holdings, Inc. Michigan Fineblanking Inc., a Michigan corporation, and International Fineblanking Corp., an Ohio corporation, are both defunct entities and are directly and wholly owned by MPI International, Inc. MPI International, Inc. ("<u>MPI</u>") and Skill Tool & Die Holdings Corp. ("<u>Skill</u>") are the primary operating entities; Precision Parts International Services Corp. employs the corporate senior management. MPI and Skill are described in greater detail below.

**MPI.**

11.     MPI is a leading full-service designer and manufacturer of complex, high-precision metal components that are integral to engine, transmission, brake, safety and seating systems.  Products manufactured by MPI begin with the fineblanking process.  Fineblanking is a specialized process that combines the principles of metal stamping and cold-forming and was developed to overcome the limitations of conventional stamping.  The process is most suitable for smaller, intricate parts such as components for automobile transmissions, brakes and engines.  Fineblanking fills a niche for the manufacture of parts that, due to their complexity, would otherwise require multiple machining processes or could not be manufactured at competitive costs.   MPI also offers complete tool-build services, as well as full-service finishing and assembly capabilities.

12.      Founded in 1969, MPI operates facilities in Indiana, Wisconsin and Tennessee, and employs approximately 98 salaried and 655 hourly employees.

13.     The Debtors' operations under MPI also include MPI's contractual arrangement with Intermex (the "Mexican Facility").  The Mexican Facility produces parts for certain of MPI's customers using conventional metal stamping processes.  The Mexican Facility uses tooling and equipment owned by MPI; however, most other aspects of the operation, including employees, building lease, and nearly all third party contracts, are contracted through Intermex on a "cost plus" basis.  The Debtors have no ownership interest in Intermex.

**Skill.**

14.     Formed in 1966, Skill operates a facility in Ohio and employs approximately 14 salaried and 56 hourly employees.

15.     Skill produces parts with conventional stamping and assembly processes.  Skill specializes in large high precision stampings of up to 50" width. Skill's capabilities include in-die extrusion and tapping, stampings requiring a class A surface and deep draw stampings.  Skill also produces miscellaneous interior, non-class A stampings for its customers.  Skill offers its customers services in engineering, in-house tooling development and manufacturing technology.

**The Debtors' Holding Companies.**

16.     Four of the Debtors are holding companies that have no employees and are not involved in the Debtors' day-to-day operations:  PPI Holdings, Inc., PPI Sub-Holdings, Inc., MPI International Holdings, Inc. and Skill Tool & Die Holdings Corp.

**B.      The Company's Markets and Competitive Position.**

17.     The Debtors design and manufacture products for a broad group of customers including light vehicle, construction, agricultural and lawn and garden Tier 1 and 2 suppliers and OEMs.  The Debtors' customer base is diversified and no single customer accounts for more than approximately 30% of overall sales.   The Debtors maintain strong market positions in the markets and product lines where they compete, and their strategically located facilities contribute to their competitive advantage in the marketplace, allowing them to deliver products on a just-in-time basis at low total delivered cost.

18.     In 2007, the Debtors' annual sales exceeded $197 million, and the Debtors' combined sales for the first ten months of 2008 exceeded $141 million.   MPI generated approximately $168 million in sales for 2007 and $128 million in sales for the first ten months of 2008.  Skill generated approximately $29 million in sales for 2007 and $13 million in sales for the first ten months of 2008.

**The Automotive Market.**

19.    The Debtors supply the North American light vehicle industry. The Debtors generated approximately 38% of their 2007 revenues from direct sales to automotive OEMs. Approximately 45% of the Company's overall light vehicle sales in 2007 were derived from sales to Tier 1 and Tier 2 suppliers, including Tier 1 and Tier 2 suppliers to Asian OEMs.

20.    The Debtors believe that there is no competitor with the Debtors' extensive range of products and capabilities based on fineblanking. The Debtors have very few competitors with respect to products such as clutch plates and separator plates. The Debtors are also able to provide superior finishes, including double-disc grinding which is, to the Debtors' knowledge, a unique capacity in the industry. The Debtors' finishing capabilities allow them to be a "one stop shop" for fineblanked parts. The Debtors' Tennessee facility has also developed a special competence in efficiently producing low volume runs for customers.

**Other Industrial Markets.**

21.    The Debtors design and manufacture products for Tier 1 and 2 suppliers and OEMs of agricultural and lawn and garden equipment, appliances and other industrial applications. These customers accounted for approximately 17% of the Debtors' consolidated revenue in 2007.

22.    In recent years, the agricultural and lawn and garden equipment markets experienced stable growth, while construction equipment spending had been in a cyclical upturn. The Debtors recognize, however, that these trends are likely to be affected by the current financial and economic crisis in the U.S. and global economies.

23.    As set forth above, the Debtors' overall operations and competitive position are robust, particularly with respect to its fineblanking operations. In addition to their full-service capabilities, the ability to respond quickly to specialty or custom low volume requirements

-7-

(particularly in many of the Debtors' construction and agricultural applications) is an important competitive advantage. Further, the Debtors' dominant position in the niche application of fineblanking is a barrier to entry for competitors.

24. The Debtors' strategically located facilities contribute to their competitive advantage in the marketplace. The Debtors have carefully selected facility locations that are in close proximity to customers in order to deliver many of their products on a just-in-time basis at the lowest total delivered cost.

### C. The Company's Products.

25. The Debtors sell a portion of their products directly to OEMs as finished components; however, most of the Debtors' products are used to produce "systems" or "subsystems," i.e., groups of component parts located in the vehicle operating together to fulfill a specific vehicle function. Generally, the MPI's highest-selling products can be classified into the following categories: (a) transmission components, including clutch subassemblies, shift detent assemblies and cam actuators; (b) engine components, including engine manifolds, engine safety release flanges and fuel system components; and (c) climate control, including hydraulic pump components and air conditioner compressor valve plates. Skill's highest-selling products can broadly be classified into the following categories: (a) automotive structural components, including tire brackets, body-under-frame components and side-impact beams; (b) other automotive components, such as backing plates and fasteners; and (c) industrial components, such as faucet throat plates.

### III. SUMMARY OF PREPETITION INDEBTEDNESS.

26. As of the Commencement Date, the Debtors' total secured and unsecured long-term liabilities were approximately $184.5 million. The Debtors' aggregate trade debt as of the Commencement Date was approximately $30 million.

-8-

27.     The Debtors' prepetition, long-term debt structure was composed of: (a) a secured senior term loan, secured revolver and secured junior term loan issued under a Senior Credit Agreement dated as of September 30, 2005 (as amended from time to time, the "Prepetition Senior Credit Agreement"); and (b) loans issued under a Subordinated Note Purchase Agreement dated as of September 30, 2005 (as amended from time to time, the "Prepetition Mezzanine Agreement").  Additionally, Skill is liable on industrial development revenue bonds issued on August 1, 1999, which are secured by an irrevocable letter of credit issued under the Prepetition Senior Credit Agreement.  The remainder of this section summarizes the Debtors' primary long-term debt obligations in order of priority:

**A.     The Senior Credit Agreement.**

28.     On September 30, 2005, PPI Sub-Holdings, Inc., MPI International Holdings, Inc., Precision Parts International Services Corp., Precision Gear Holdings, Inc.[3] and Skill Tool & Die Holdings Corp. (collectively, the "Prepetition Borrowers") entered into the Prepetition Senior Credit Agreement in connection with the 2005 acquisition of PPI by First Atlantic.  The syndicate of institutional lenders under the Prepetition Senior Credit Agreement (the "Prepetition Senior Lenders") was led by General Electric Capital Corporation ("GECC" or the "Prepetition Agent") as administrative agent and collateral agent.  Pursuant to the Prepetition Senior Credit Agreement, the Prepetition Senior Lenders agreed to extend revolving and term credit facilities to, and to issue letters of credit for, the Prepetition Borrowers from time to time, including, *inter alia* (i) revolving loans in an aggregate committed amount of up to $19,701,497.89 (as amended from time to time, the "Prepetition Revolver"); (ii) term loans in an aggregate original principal

---

[3]     Precision Gear Holdings, Inc. was subsequently sold on June 2, 2008 to OEP Precision Holdings LLC, an entity not affiliated with First Atlantic.

#10312544 v9

amount of $115,000,000 (as amended from time to time, the "Prepetition Senior Term Loan"); and junior term loans in an aggregate original principal amount of $14,000,000 (as amended from time to time, the "Prepetition Junior Term Loan"). The Prepetition Borrowers' obligations under Prepetition Senior Credit Agreement are guaranteed by PPI Holdings, Inc. and secured by a first-priority lien against substantially all of the Debtors' assets as outlined in the Prepetition Guaranty and Security Agreement executed as of the same date by each of the Prepetition Borrowers.

29.     The Prepetition Senior Credit Agreement has been amended thirteen times. The amendments provided, *inter alia*, for the waiver of certain covenant defaults and the revision of certain financial and reporting covenants.

30.     In connection with one of the amendments to the Prepetition Senior Credit Agreement, the Prepetition Borrowers entered into a Junior Term Loan Joinder Agreement dated as of February 22, 2008 with First Atlantic (through its investment fund, AEP) and the Prepetition Mezzanine Lenders (as defined below) (together with First Atlantic, the "Prepetition Junior Lenders"). Under the Junior Term Loan Joinder Agreement, the Prepetition Junior Lenders became parties to the Prepetition Senior Credit Agreement, with a "last-out" share in the Prepetition Senior Lenders' liens, subordinate to the interests of the Prepetition Senior Lenders. The Prepetition Junior Lenders issued the Prepetition Junior Term Loan, which was funded in two $7 million tranches in February and April 2008. Interest under the Prepetition Junior Term Loan is payable in kind ("PIK"), and the total balance owed on the Prepetition Junior Term Loan as of the Commencement Date was approximately $14.8 million.

31.     As of the Commencement Date, the total amount outstanding under the Prepetition Senior Credit Agreement (*excluding* accrued interest, amendment and forbearance fees, costs, expenses and letters of credit) was approximately $89.1 million.

**B.      The Subordinated Notes.**

32.     Also on September 30, 2005, PPI Holdings, Inc. and PPI Sub-Holdings, Inc. entered into the Subordinated Note Purchase Agreement (as amended from time to time, the "Prepetition Mezzanine Agreement") with Norwest Mezzanine Partners II, LP, LEG Partners Debenture SBIC, L.P. and Golub Capital CP Funding LLC (collectively, the "Prepetition Mezzanine Lenders").  This transaction was also in connection with the 2005 acquisition of PPI by First Atlantic.  The Prepetition Mezzanine Agreement originally provided for aggregate unsecured borrowings of $55 million consisting of a seven year, non-amortizing term loan (as amended from time to time, the "Prepetition Mezzanine Loan").

33.     The Prepetition Mezzanine Agreement has been amended five times, as a result of which the principal balance was increased from $55 million to $85.5 million.  As of the Commencement Date, the total amount outstanding under the Prepetition Mezzanine Agreement (including accrued interest) was approximately $88.5 million.

**C.      The Skill Industrial Development Revenue Bonds.**

34.     On August 1, 1999, the County of Lorain, Ohio issued $6.5 million in industrial development revenue bonds ("IDRBs") and loaned the proceeds to Skill to assist in the construction of Skill's Avon, Ohio facility and the acquisition and installation of equipment.  The IDRBs are secured by an irrevocable letter of credit and mature on August 1, 2014.  As of the Commencement Date, the total amount outstanding under the IDRBs (including accrued interest) was approximately $2 million.

#10312544 v9

**D. The Subordination and Intercreditor Agreement.**

35. Contemporaneous with the execution of the Senior Credit Agreement and the Subordinated Note Purchase Agreement, the Mezzanine Lenders entered into a Subordination and Intercreditor Agreement (the "Prepetition Intercreditor Agreement") with GECC in its capacity as administrative agent and collateral agent for the Debtors' collateral pledged under the Prepetition Guaranty and Security Agreement. The Intercreditor Agreement sets forth the relative priorities of the lenders' liens in the various Debtors' collateral granted under the Prepetition Guaranty and Security Agreement.

**IV. EVENTS LEADING TO CHAPTER 11.**

**A. Changes in the Automotive Industry and the Resulting Business Challenges.**

36. While the Debtors' non-automotive markets remain relatively strong, the North American light vehicle industry is currently in the midst of an overall restructuring, complicated by the current global financial and economic crisis. Both domestic OEMs and certain suppliers have faced troubling times in recent years caused by (a) a steady decline in market share by domestic OEMs, (b) noncompetitive cost structures as a result of inflated union wages and pension and legacy costs, (c) significant increases in raw material prices (*e.g.*, steel and resin), and (d) excess production capacity.

37. In order to lower costs and improve quality, OEMs are awarding sole-source contracts to full-service suppliers who have the capability and ability to design and manufacture their products. OEMs and suppliers are continually looking for opportunities to source product in developing countries as a means to lower costs and improve margins and profit. To minimize supply chain costs and allow for rapid shifts in manufacturing output (in response to consumer purchasing trends), the automotive supply chain follow the just-in-time model, in which they maintain typically no more than one to three days' inventory of parts and raw materials, and at

times for certain parts schedule delivery of components in part number sequence directly to the assembly line. This system requires highly choreographed design, purchasing, shipping, warehousing, and manufacturing operations. Thus, disruption at any level of the production process could have a dramatic ripple effect up and down the automobile supply chain.

38.     In response to these changes, and similar trends in the other markets in which the Debtors compete, the Debtors' various facilities have developed wider and more efficient product-manufacturing and technical capabilities. The Debtors have broadened their geographic coverage and strengthened their ability to design and manufacture products by developing and maintaining state-of-the-art facilities within the United States that are strategically located in close proximity to their customers as a means to reduce freight and delivery costs and deliver products on a just-in-time basis. In addition, the Debtors have sought to reduce material costs by centralizing purchasing and reducing inventories through steel purchase management and elimination of external storage, reduce manufacturing costs through implementation of a "lean" material system and improved productivity, and rationalize operations through elimination of excess capacity.

39.     These efforts continue to be complicated by the nature of the Debtors' production "programs" with Tier 1 and 2 automotive suppliers and OEMs in all lines of their business. The Debtors typically enter into arrangements with customers to supply product for a particular platform with a certain tooled capacity. These arrangements have a duration equal to the life of the platform, which is generally three to seven years for automotive vehicles. The terms of these arrangements do not require that customers commit to purchasing a minimum quantity.

40.     The Debtors must undergo a rigorous certification process for each part or assembly that will be integrated into the final product. Many of the parts the Debtors produce

have a lead time of approximately two years from product development to production due to extensive testing and evaluation. Major new product launches may require the Debtors to allocate production space and make upfront investments in new equipment and tooling necessary to design and manufacture the product. These investments are generally funded by cash from operations, incurring additional indebtedness, or issuing additional equity. It often takes several years before the Debtors realize any revenues related to investment in new equipment, tooling, and engineering supporting new production.

41. The Debtors compete for new business at the beginning of the development process for new and successor platforms. If the Debtors fail to obtain new business on new models or to retain or increase business on redesigned existing models, their business and financial results are directly and negatively affected. The relatively long lead times required for the production of many of the Debtors' complex structural components and the lengthy process associated with obtaining awards of new business from Tier 1 and 2 suppliers and OEMs make it difficult for the Debtors to obtain new sales arrangements to replace any unexpected decline in the sale of existing products. Thus, significant volume reductions by OEMs have a negative impact on the Debtors' profitability.

42. Additionally, the Debtors' liquidity and profitability are highly dependent on the cost of raw materials, particularly steel. Increases in the cost of steel dramatically impact the Debtors' profit margins on all products. The Debtors participate in steel purchase programs or directed buy programs with certain OEM customers, which allow the Debtors to take advantage of high volume discounts, but these discounts do not eliminate the impact of significant increases in raw material costs. If the Debtors are unable to pass increases in raw material costs on to their customers, the Debtors' profit margins are directly and negatively affected.

43.     The Debtors' liquidity and profitability are also impacted by the price for steel scrap, or "offal." The nature of the Debtors' fineblanking and precision stamping operations results in a high volume of offal. The Debtors resell their offal to certain scrap steel customers, which allows the Debtors to recoup some of the costs of the raw material. However, when the price of offal drops, the Debtors' profit margins are directly and negatively affected. In recent months, the price of offal has dropped precipitously, from $.40/lb. in July 2008 to $.05/lb. in November 2008. This drop in price has had a significant negative impact on the Debtors' financial condition.

**B.     Deteriorating Conditions in Automotive Sector.**

44.     Over the last several years, the Debtors have focused on reducing costs, maximizing cash return on invested capital, reducing indebtedness and matching capital expenditures with operational cash flow in order to mitigate against expected production slowdowns.

45.     Historically, the Debtors were also able to generate sufficient cost savings to offset any price concessions made to customers or raw material price increases.

46.     Recently, however, the Debtors' operational flexibility has been severely restricted as a result of declining North American OEM production levels and increased raw material and other costs that the Debtors cannot fully pass along to customers, as well as continued price pressure from customers.

47.     It is well documented that the North American OEM market share and overall production levels for both cars and light trucks has declined significantly in recent years. As recently as 1999, GM, Chrysler, and Ford (the "Big Three") enjoyed a collective 62% U.S. market share. In the first half of 2007, the Big Three's collective market share fell to approximately 52%. That trend has been exacerbated by the current global financial and

economic crisis, which has resulted in dramatically reduced consumer spending. Sales in the automotive industry in October 2008 were down nearly 32% as compared with October 2007. The Big Three's precipitous loss of market share has devastated the automotive supply chain by decreasing volume production while at the same time the OEMs have continued to pursue aggressive price-down strategies. All of these factors have caused revenues and profit margins of the automotive suppliers to shrink significantly.

### C.     The Debtors' Deteriorating Financial Condition.

48.     The Debtors' revenue through third quarter 2008 declined to $126.2 million from $154.5 million in the same period in 2007. Specifically, the Debtors' revenue has been negatively impacted by the following factors:

#### (a)     Decline In Domestic Automobile Production Volume.

49.     First, the continuous decline in market share and overall production of the Debtors' largest North American OEM customers has decreased the volume of the Debtors' business and resulted in a lower volume of sales to Tier 1 and 2 customers that supply these same OEMs.

50.      For the first time since the early 1990s, the sales of light trucks and sport utility vehicles have declined as a result of significant increases in the price of crude oil and, consequently, the price of gasoline. Efforts by OEMs to transition away from light truck products toward passenger cars and to reduce excess inventory have diminished the Debtors' revenues associated with the light vehicle market.

#### (b)     Lower Pricing.

51.     With the decrease in OEM production levels, the Debtors have been unable to generate sufficient production costs savings to offset price reductions, especially in light of OEM demands for price reductions. Additionally, many of the Debtors' long-term supply contracts

with its Tier 1 and 2 and OEM customers already provide for regular price decreases over the life of the contract. In certain instances raw material price increases along with OEM price reductions have caused the Debtors to supply products to customers at prices that do not cover the Debtors' production costs.

**Increasing Costs.**

52. Some of the Debtors' supply contracts with their Tier 1 and 2 and OEM customers do not allow the Debtors to pass increased raw material costs fully through to their customers. The Debtors thus have borne the impact of key raw materials costs that have escalated in 2008 in the form of higher costs of goods sold resulting in decreased margins on many product lines.

53. Not surprisingly, the Debtors have faced liquidity constraints, which have been further exacerbated by the carrying costs of the Debtors' highly leveraged balance sheet. By November 30, 2008, the Debtors had only approximately $0.6 million in unswept cash and Prepetition Revolver availability, taking into account the $4.5 million block on the Revolver.

54. Throughout this period, the Debtors have been saddled by over $184 million in secured and unsecured long-term debt. As liquidity pressures increased over the course of the last year, the Debtors were unable to service that debt. Thus, beginning in January 2008, the Debtors entered into a series of forbearance agreements and amendments to the Prepetition Senior Credit Agreement, including waivers of certain covenant and financial defaults (collectively, the "Forbearance Agreements"). The Debtors have operated under the Forbearance Agreements since January 2008 (the "Forbearance Period"). During the Forbearance Period, the Debtors have made regular interest and principal payments and, since June 2, 2008, have accrued

additional unpaid default interest of 2%. These interest payments have placed additional strain on the Debtors' cashflow and contributed to the Debtors' liquidity difficulties.

**D.     The Debtors Cannot Meet Their Financial Obligations.**

55.     As a result of the Debtors' extensive leveraging and the necessity of operating under a cash dominion system, the entirety of the Debtors' cashflow from operations is obligated for the servicing of existing indebtedness, with the Debtors' only liquidity being its borrowing availability under the Revolver. With the cumulative adverse effects of the above-mentioned factors and the Debtors' inability to reduce costs or increase prices sufficiently, the Debtors' limited availability under the Revolver has left the Debtors unable to meet their financial obligations.

56.     Between November 21, 2008 and the Commencement Date, with no prospect of third party financing, the Debtors negotiated extensively with their prepetition secured lenders in order to obtain a post-petition financing facility. Those negotiations proved successful, and certain of the Debtors' prepetition lenders agreed to provide post-petition financing to the Debtors on the terms described in more detail below.

**E.     The Debtors' Restrictive, Highly Leveraged Debt Structure Cannot Be Addressed Outside of Chapter 11.**

57.     The Debtors' operational capacities and competitive position are strong. However, the Debtors' highly leveraged position has made them more vulnerable to the economic downturns in the automotive sector. Moreover, it has limited the Debtors' ability to withstand competitive pressures and garner new business awards, and has reduced their ability to respond to rapidly changing auto industry conditions.

58.     The Debtors expect to work with their principal economic stakeholder constituencies to use these chapter 11 cases to address the foregoing challenges and preserve the value of the estates' assets.

## PART II

## FIRST DAY MOTIONS

### I.     PROCEDURAL MOTIONS.

#### A.     Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases.

59.     The Debtors in these chapter 11 cases are "affiliates," as that term is defined in section 101(2) of the Bankruptcy Code. To facilitate the orderly administration of these cases, the Debtors have requested that the Court jointly administer the chapter 11 cases. Joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor. I believe joint administration will result in a more efficient administration of these chapter 11 cases by eliminating the need to file each document in each individual case and to maintain individual case files for each of the Debtors. Thus, joint administration will reduce the case administration costs incurred by the Debtors' estates. In addition, and perhaps more importantly, I believe that joint administration will facilitate the ability of parties in interest to monitor these cases by grouping all pleadings together on one docket.

60.     The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates. Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates. Thus, individual creditors'

rights will not be harmed by the relief requested; by contrast, non-debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

**B.    Motion of the Debtors for Entry of an Order Granting the Debtors Additional Time Within Which to File Schedules and Statements.**

61.    The Debtors have thousands of potential creditors.  Further, the conduct and operation of the Debtors' business operations require the Debtors to maintain voluminous records and complex accounting systems.  Due to the nature of the Debtors' business, limited staff available to perform the required internal review of the Debtors' business and affairs and the press of numerous other matters incident to the commencement of these chapter 11 cases, I believe that the 30-day automatic extension of time to file the schedules and statements of financial affairs (collectively the "Schedules and Statements") provided under Del. Bankr. L.R. 1007-1(b) will not be sufficient and indeed may be impossible.

62.    Accordingly, the Debtors respectfully request that the Court extend by an additional 15 days, for a total of 45 days, the date by which the Schedules and Statements must be filed, pursuant to Bankruptcy Rule 1007.  I believe that the substantial size, scope, and complexity of these chapter 11 cases and the volume of material that must be compiled and reviewed by the Debtors' staff in order to complete the Schedules and Statements for each Debtor during the initial days of these chapter 11 cases provides ample cause for justifying the requested extension.

**C.    Kurtzman Carson Consultants LLC Retention Application**

63.    The Debtors anticipate that there will be approximately 4,300 individuals or entities that the Debtors will be required to serve with various notices, pleadings, and other documents filed in these cases.  The significant number of parties in interest involved in the Debtors' chapter 11 cases may impose heavy administrative and other burdens on the Court and

the Office of the Clerk of the Court (the "Clerk").  To relieve the Clerk of these burdens, and to comply with Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Debtors seek to engage Kurtzman Carson Consultants LLC ("KCC") as an independent third party to act as the Debtors' claims, noticing and balloting agent.  I am familiar with KCC's professional reputation in such capacity, and I believe that KCC will effectively and efficiently perform the tasks of noticing creditors and all other relevant constituencies of the filing of these chapter 11 cases, as well as transmitting, receiving, docketing and maintaining proofs of claim filed in connection with these chapter 11 cases.  I believe that this Court should authorize the retention of KCC as the Debtors' claims and noticing agent.

## II.    OPERATIONAL MOTIONS.

64.    Several of the First Day Motions request authority to pay certain prepetition claims.  Because Rule 6003 provides that "except to the extent relief is necessary to avoid immediate and irreparable harm," the Court shall not consider motions to pay prepetition claims during the first 20 days after the filing of a petition, the Debtors have narrowly tailored their requests for authority to pay prepetition claims to those circumstances where the failure to pay such claims would bring immediate and irreparable harm, as set out in more detail in the related motions and below.

**A. Motion of the Debtors for Entry of an Order (a) Authorizing, but Not Directing, the Debtors To Pay Certain Accrued Prepetition (i) Wages, Salaries, and Other Compensation, (ii) Employee Medical and Similar Benefits, (iii) Certain Limited Obligations To Former Employees, and (iv) Reimbursable Expenses; (b) Authorizing, but Not Directing, the Release of Trust Fund Taxes and Employee Contributions Withheld from Employees' Paychecks; and (c) Authorizing and Directing Banks and Financial Institutions To Pay All Checks and Electronic Payment Requests Made By the Debtors Relating To the Foregoing.**

65.     As of the Petition Date, the Debtors employ approximately 823 employees, (the "Employees"), of whom approximately 711 are hourly employees (the "Hourly Employees") and 112 are full-time salaried employees (the "Salaried Employees").

66.     The Debtors' Employees perform a variety of critical functions, including automotive parts manufacturing, skilled trades, machine operation, general labor and a variety of engineering, administrative, accounting, supervisory, consultant, management, and other tasks. The Debtors must retain their Employees' skills and their knowledge and understanding of the Debtors' infrastructure, operations and customer relations to preserve the value of the estates' assets and maximize creditors' recoveries.

67.     The Debtors' average aggregate monthly gross compensation for MPI and PPI Employees, including wages and salaries, is approximately $2,290,000. The Debtors' average aggregate monthly gross compensation for Skill Employees, including wages and salaries, is approximately $230,000. The Debtors pay their Salaried Employees at MPI and PPI on a bi-weekly basis for the previous fourteen days' work, and their Salaried Employees at Skill and the Hourly Employees at both MPI and Skill on a weekly basis, one week in arrears (each a "Pay Period").

68.     As of the Commencement Date, the Debtors have not paid their Employees all prepetition wages held in arrears. The Debtors have funded their payroll for both Hourly and Salaried Employees that would normally be due. Out of an abundance of caution, the Debtors

-22-

are asking for authority to pay such amounts, and are therefore estimating that, as of the Commencement Date, one Hourly Pay Period is outstanding and as much as one salary Pay Period may still be outstanding, consisting of approximately $722,000 for MPI and PPI Employees and $54,000 for Skill Employees in accrued wages, salaries, overtime pay and other compensation (excluding reimbursable expenses and vacation pay) earned prior to the Commencement Date (the "Unpaid Compensation") by Employees. The Debtors seek authority to pay such Unpaid Compensation to the Employees and all costs incident thereto. If the Debtors' Motion is granted, the Debtors will not pay any Employee more than $10,950 for such Unpaid Compensation.

69.     In addition, the Debtors utilize the services of approximately 49 temporary workers (the "Temporary Workers") and approximately 6 independent contractors (the "Independent Contractors"), including the Debtors' outside sales representatives, who are typically the Debtors' primary point of contact with their customer accounts.

70.     The Temporary Workers work on an hourly basis and their services are procured through employment agencies. The Debtors remit compensation for the Temporary Workers' services directly to the applicable employment agencies, which in turn pay the Temporary Workers (the "Temporary Compensation"). The Debtors incur approximately $45,000 in Temporary Compensation obligations per month. The Debtors seek authority to pay any unpaid prepetition amounts for Temporary Compensation to the employment agencies and all costs incident thereto. In addition, the Debtors seek authority, but not direction, to continue to pay the Temporary Compensation in the ordinary course of business, as routinely done prior to the Commencement Date.

#10312544 v9

71.     The Debtors pay certain of the Independent Contractors on a commission basis and provide their compensation directly to the Independent Contractors with a check.  As of the Commission Date, accrued but unpaid commissions to Independent Contractors totaled approximately $35,000.  The Debtors seek authority to pay any unpaid prepetition amounts to the Independent Contractors and to continue to pay the Independent Contractors in the ordinary course of business, as routinely done prior to the Commencement Date.  The Debtors do not believe that any Temporary Worker or Independent Contractor is owed more than $10,950.

72.     Additionally, prior to the Commencement Date, and in the ordinary course of their businesses, the Debtors routinely reimbursed Employees for certain expenses incurred on the Debtors' behalf (the "Reimbursable Expenses").  Reimbursable Expenses include expenses for meals, parking, automobile mileage, tuition and other business-related expenses.  I believe that, as of the Commencement Date, approximately $21,000 in Reimbursable Expenses remained unpaid to Employees per combined Hourly and Salaried Pay Period.

73.     The Debtors also provide Employees, in the ordinary course of business, with a number of employee benefits (collectively, the "Employee Benefits"), including, but not limited to:  (a) medical and dental insurance; (b) workers' compensation; (c) vacation time and earned time off; (e) 401(k) plans; and (f) other miscellaneous employee benefits.

74.     I believe that the commencement of these chapter 11 cases will likely cause uncertainty and some level of concern among the Employees, Temporary Employees and Independent Contractors.  In this context, nonpayment of compensation and benefits, in addition to imposing real hardship upon the Employees, Temporary Employees and Independent Contractors, would likely generate doubts about the stability of the Debtors, could severely undermine morale, and may create a significant risk of attrition.  To retain the Employees,

Temporary Employees and Independent Contractors and ensure the continued availability of their expertise, therefore, as set forth in more detail below and in the motion, the Debtors seek to pay prepetition employee-related obligations when due or as expected.

75.    Specifically, the Debtors seek authority to pay and honor, in their sole discretion, certain prepetition claims for, among other items, wages, salaries, commissions, bonuses, payments to temporary employee agencies, and other compensation, federal and state withholding taxes and other amounts withheld (*e.g.*, garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions), Employee medical, prescription, and dental benefits, vacation time and earned time off, short- and long-term disability coverage, and additional employee benefits, as well as honoring certain limited obligations to former Employees, and all other Employee benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "Employee Wages and Benefits"), and to pay all costs incident to the foregoing. The Debtors also seek authority, in their discretion, to pay the Reimbursable Expenses.

76.    Finally, the Debtors request that banks and other financial institutions be authorized and directed to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing.

**B.    Motion of the Debtors for Entry of an Order Authorizing the Debtors to Continue, in the Ordinary Course of Business, Their Customer Programs and Practices.**

77.    Prior to the Commencement Date, and in the ordinary course of their businesses, the Debtors engaged in certain practices to streamline their operations and reduce costs. In particular, the Debtors participate in steel resale and debit programs with certain of their Customers (collectively, the "Steel Resale Programs"). Under these programs, the Debtors have the opportunity to purchase steel at a Customer-negotiated price by buying through their

Customers' accounts with various steel manufacturers. In such instances, the Customer will purchase steel on the Debtors' behalf, and subsequently will deduct the steel cost from payables owed to the Debtors for the goods the Debtors manufacture with such steel. The Debtors realize cost savings by purchasing their primary raw material through their Customers' high-volume steel programs. As of the Commencement Date, the Debtors estimate the amount of payables to be deducted by Customers under Steel Resale Programs is $7.3 million.

78.     The Steel Resale Programs do not represent typical "customer programs," as the Debtors do not directly extend benefits to their customers. Rather, the Debtors realize cost savings by purchasing their primary raw material through their customers' high-volume steel programs. Where appropriate in light of their post-petition operations, and their relationship with particular customers, the Debtors seek to continue, in their discretion, their participation in their customers' Steel Resale Programs

79.     I believe that the Debtors' creditors also will benefit from the relief sought in this Motion. I believe that if the Debtors are prohibited from honoring their obligations under the Steel Resale Programs consistent with their past business practices, the Debtors risk losing the cost benefits of participating in such programs. Moreover, in my judgment, the Customers' lost support could damage the Debtors' businesses to an extent that far exceeds the cost associated with honoring and continuing such practices. The relief requested in this Motion preserves the Debtors' ability to manage their operations in a manner that will maintain the value of their estates during this critical time.

80.     In connection with the Steel Resale Programs discussed above, I believe that a significant number of valid mutual claims and obligations may exist between the Debtors and certain of their Customers. Requiring separate Court approval of each setoff arising as a result of

the Steel Resale Programs between the Debtors and their Customers, however, would be administratively burdensome to the Court and costly for the Debtors' estates. In addition, because I believe that many of the Customers may be unwilling to continue to remit any net invoice payments to the Debtors until steel setoffs can be effected, the costs and delays associated with seeking individual Court approval for each of these ordinary course transactions would adversely affect the efficient operation of the Debtors' businesses and the Debtors' ability to collect their accounts receivable. I anticipate that some Customers may even bar the Debtors from their Steel Resale Programs, thereby depriving the Debtors of a significant benefit.

81. The Debtors will not incur any out-of-pocket costs to satisfy any net claims of their Customers under the Steel Resale Programs, and they should be able to recover any net obligations expeditiously. The ability to resolve ordinary course setoff issues amicably will greatly increase the Debtors' ability to collect any net obligations and maintain business as usual. Equally importantly, this relief will ensure that the Debtors are able to continue to participate in the Steel Resale Programs and reap the benefits of discounted steel prices.

82. The Debtors seek to continue to participate in the Steel Resale Programs as they have proven to be successful and cost-saving business strategies in the past. I believe that continuing these benefits throughout the chapter 11 cases is critical to maintaining the value of the Debtors' estates, and that is therefore essential that the Court authorize the Debtors to perform their prepetition obligations related to the foregoing Steel Resale Programs, permit the Debtors to determine whether to continue, renew, replace, implement new, or terminate the Steel Resale Programs, in the ordinary course of business, without further application to the Court, and modify the automatic stay to the extent necessary to authorize the Debtors, in their sole

discretion, to permit setoffs pursuant to the Steel Resale Programs in the ordinary course of business.

**C.      Motion of the Debtors for Entry of an Order Authorizing Debtors to Pay Prepetition Premiums Necessary to Maintain Insurance Coverage in Current Effect.**

83.      In the ordinary course of the Debtors' businesses, the Debtors retain and maintain numerous insurance policies providing coverage for, *inter alia*, property, general liability, excess liability, automobile liability, workers compensation, directors' and officers' liability, and employment practices liability (collectively, the "Insurance Policies").  I believe that the Insurance Policies are essential to the preservation of the Debtors' businesses, property, and assets, and, in many cases, such coverages are required by the various regulations, laws, and contracts that govern the Debtors' commercial activity.

84.      The annual premiums for the Insurance Policies, which the Debtors maintain through several different insurance carriers, total $1,277,278.  It is not always economically advantageous for the Debtors to pay the premiums on all of the Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtors' business, the Debtors finance the premiums on some of their Policies pursuant to a premium financing agreement with a third-party lender. Those policies which are not financed are either paid up front or paid by monthly installments directly to the Debtors' insurers.  Certain prepetition premiums have not been paid.

85.      With respect to the Insurance Policies, the Debtors have made down payments totaling $62,667.00. The Existing PFA (as defined in the Motion) presently requires eight monthly installments of $35,702.70 and bears a total finance charge of $7,374.60 on the total financed amount of $278,274.00.  The annual interest rate under the Existing PFA is 7.020%. The D&O/EPL Fiduciary Run Off policy lump sum of $18,693.00 has not been paid.  The remaining annual insurance premiums totaling $912,766.00 were billed and paid in monthly

-28-

installments directly to the Debtors' insurers. Also, a $4,905.00 downward adjustment in the annual policy amount is required because certain of the policies are for a term of 11 months. The Debtors file this motion seeking authority, but not direction, to pay any prepetition premiums that may have accrued but not been paid prior to the Commencement Date, as well as the monthly payments of $35,702.70 under the Existing PFA. In addition to the Existing PFA monthly payments, the Debtors also pay approximately $76,000.00 per month to insurance providers that bill the Debtors directly for premiums.

86.     I believe that it is the Debtors' business practice to pay Insurance Premiums in a timely fashion. Failure to make ongoing premium payments when due, if any, will cause harm to the Debtors' estates in several ways. First, if the Debtors fail to make their payments, insurers will be permitted to terminate the Insurance Policies to recoup their losses. The Debtors would then be required to obtain replacement insurance on an expedited basis. This replacement insurance likely would require not only that the Debtors pay a lump-sum premium for the insurance policy in advance, but would involve a higher overall cost than the premium the Debtors currently pay.

87. Even if the insurers were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe and adverse impact on the Debtors' ability, in the ordinary course of business, to renew any Insurance Policies that expire postpetition. In view of the importance of maintaining the Insurance Policies, I believe that the Debtors should be allowed to honor their obligations under the existing Insurance Policies. As described above, any other alternative would likely require considerable additional cash expenditures. Accordingly, I believe it is in the best interest of the Debtors' creditors and estates to authorize

#10312544 v9

the Debtors to maintain the Insurance Policies and that the estates would suffer immediate and irreparable harm if the insurance coverage lapsed.

**D.    Motion of the Debtors for Entry of Interim and Final Orders (a) Prohibiting Utility Providers From Discontinuing, Altering, or Refusing Service, (b) Deeming Utility Providers Adequately Assured of Future Payment, and (c) Approving Procedures for Determining Requests for Additional Assurance.**

88. In connection with the operation of their businesses, the Debtors obtain gas, water, sewer, electric, telecommunications and other similar utility services provided by numerous utility companies (the "Utility Providers"). The Debtors pay the Utility Providers, on average, approximately $353,062.88 per month in the aggregate for services provided.

89. Prior to the Commencement Date, the Debtors paid the Utility Providers on a timely basis. Likewise, it is my understanding that the Debtors fully intend to pay postpetition obligations owed to the Utility Providers in a timely manner. Moreover, I expect that the Debtors will have sufficient liquidity and availability under their proposed postpetition credit facility to pay all postpetition utility obligations.

90. I believe that uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to preserving the value of the Debtors' estates. Should the Utility Providers refuse or discontinue service, even for a brief period, I believe that the Debtors' business operations would be severely disrupted, and the impact on the Debtors' business operations, customer relationships, revenue, and profits would be extremely harmful. In particular, any interruption would impair the Debtors' ability to manufacture and ship parts and would risk shutting down the Debtors' Tier 1 and 2 and OEM customers. The impact on the business would be immediate and jeopardize the Debtors' chapter 11 efforts. Consequently, I believe that it is critical that utility services continue uninterrupted.

#10312544 v9

91. To ensure uninterrupted service, the Debtors propose to deposit a sum equal to approximately fifty percent (50%) of their average aggregate monthly payment for Utility Services, or $176,531.44, into an account maintained by the Debtors (the "Utility Deposit Account" ) to provide adequate assurance of payment for future services to the Utility Providers. I submit that the Utility Deposit Account (the "Proposed Adequate Assurance") constitutes sufficient adequate assurance to the Utility Providers of payment for postpetition Utility Services. If a Utility Provider does not request additional adequate assurance, pursuant to the motion, it will be deemed to be adequately assured within the meaning of section 366 of the Bankruptcy Code.

92. The Debtors therefore request that Utility Providers be deemed to have adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, and be prohibited from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequate assurance. The Debtors also seek approval of certain procedures in connection with adequate assurance issues (the "Adequate Assurance Procedures" and "Opt-Out Procedures"). Finally, the Debtors seek a determination of a final hearing date on their proposed adequate assurance.

**E.      Motion of the Debtors, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for an Order Authorizing Them to Pay the Prepetition Claims of Certain Critical Vendors and Granting Certain Related Relief**

93.      I am mindful of the need to preserve and maximize the value of the Debtors' estates by sustaining the Debtors' enterprise as a going concern as they transition into chapter 11. Providing seamless service to their customers is key. The Debtors have highly sensitive supply chains that easily could be disrupted by a recalcitrant vendor. Any disruption could jeopardize the Debtors' ability to fulfill commitments to customers going forward, impair the Debtors' ability to collect on accounts receivables, and undermine the Debtors' hard earned reputation for

reliability. Missed or late deliveries would have an immediate and deleterious effect on the Debtors' chapter 11 prospects. To avoid such a result, the Debtors must secure an uninterrupted supply of necessary goods. To do so will require the Debtors to satisfy certain prepetition payables to Critical Vendors early in the case.

94.     The Debtors' products are designed and specifically qualified for particular applications. Typically, an OEM or Tier 1 or 2 supplier will contract with the Debtors to supply a specific product, system or component for a particular vehicle model or platform being built by the OEM or assembly being built by the Tier 1 or 2 supplier.

95.     Due to the extensive design, development and certification requirements, the normal time frame for the Debtors and their customers to select and certify a new supplier can take from 18 to 24 months. Thus, a customer may place an order early as two years before production of a new vehicle line commences. In short, the Debtors cannot readily re-source a part and shift their business to another supplier after undergoing the above-described process without losing their certification for that part. In fact, many customer contracts explicitly prevent the Debtors from changing suppliers. In such an arrangement, the vendor is well aware of the Debtors' captive status and could seek to exploit that status to its advantage. Particularly in the Debtors' situation, it is possible that a vendor could exploit this leverage and harm the Debtors' operations and relationships with its customers.

96.     To minimize inventory costs and allow for rapid shifts in manufacturing output (in response to consumer purchasing trends), OEMs and Tier 1 and 2 customers follow the "just-in-time" model, in which they maintain no more than 1-3 days inventory of parts and raw materials and may schedule deliveries of components directly to the assembly line. This system requires highly choreographed design, purchasing, shipping and manufacturing operations. The

Debtors and other automotive suppliers have adopted the same model, both in delivering their products and managing their own supply chain. Thus, any disruption at any level of the production process could have a dramatic ripple effect up and down the automotive supply chain.

97.     I therefore believe that, by ensuring continued deliveries and credit from the Debtors' suppliers, the relief sought in this Motion also will prevent the Debtors' bankruptcy cases from having a "domino effect" up and down its customer and supplier base. The Debtors themselves are generally a "sole-source provider" of critical components in vehicles produced in North America and, through their Tier 1 and 2 customers, are a major supplier to OEMs worldwide. Without timely shipments from their sole-source suppliers, the Debtors' manufacturing facilities would lack the goods necessary for their operational needs, and in some instances, could be forced to shut down certain facilities shortly after a missed shipment. A shutdown of one of the Debtors' facilities may well cause an OEM or Tier 1 or 2 supplier to halt production of a platform on one or more assembly lines. Shutting down one assembly line could cause an affected OEM to assert damages against the Debtors exceeding tens of thousands of dollars per day and could irreversibly damage the Debtors' relationship with its customer.

98.     In general, the Critical Vendors fall into two main categories: materials vendors and maintenance vendors. The materials vendors supply, among other things: bulk raw materials such as steel; components and parts directly assembled into the Debtors' products; production materials such as welding wire and lubricants, and other materials consumed in the production process. The maintenance vendors provide parts, materials, and services to the Debtors' specialized manufacturing equipment and machinery.

99.     Upon information and belief, the Debtors' vendors are well aware of their importance to the Debtors' operations. The Debtors' complex and highly integrated

manufacturing process can give an individual material or maintenance vendor significant leverage when one of its customers encounters financial straits or files for chapter 11 protection. At least some of these vendors could demand that the Debtors satisfy prepetition obligations as a condition to continuing to do business with the Debtors.

100.    Moreover, for a number of suppliers, a substantial portion of their revenues, and hence their survival, may depend on income from the Debtors.  Upon information and belief, certain of the Debtors' suppliers have untenable financial situations that have been exacerbated in recent years due to the difficulties experienced by OEMs and other automotive parts suppliers and have been magnified by the current global financial and economic crisis.  Other suppliers have small operations highly dependent upon the Debtors' business for their continued viability. Many of these smaller vendors have limited access to capital and can ill afford their own loss of operating revenues.  Thus, the nonpayment to certain essential vendors could result in production line stoppages or other business disruptions, and might ultimately result in such vendors ceasing operations altogether or filing their own bankruptcy petitions.

101.    For the foregoing reasons, I believe that allowing the Debtors to selectively pay the prepetition claims of Critical Vendors in full or in part, on terms acceptable to the Debtors, will serve the purposes of facilitating the Debtors' operations, maximizing value for creditors, and preventing the Debtors' chapter 11 filing from pushing other companies into insolvency.

102.    To identify Critical Vendors, the Debtors, in conjunction with their financial advisors, Alvarez & Marsal North America, LLC ("A&M"), closely reviewed their accounts payable and prepetition vendor lists and consulted with facility management and others throughout the Debtors' management and purchasing operations to identify those creditors most essential to the Debtors' operations *and* most likely to face severe liquidity crises of their own if

the Debtors do not immediately pay their prepetition claims. The criteria considered included whether: (a) a particular vendor is a "sole-source" provider; (b) certain quality control requirements of the OEMs prevent the Debtors from replacing the vendor; (c) the Debtors currently receive advantageous pricing or other terms from a vendor; and (d) the severity of the vendor's operational or cash flow issues, if the Debtors do not immediately pay its prepetition claim. The Debtors also considered whether a vendor would be likely to stop shipping goods and whether an amount less than the full amount of a vendor's claim could induce continuation of shipments.

103.    Based on the Debtors' books and records, the Debtors have approximately 650 vendors with outstanding prepetition claims. Of this amount, the Debtors, together with A&M, have determined that the claims of approximately 8 vendors, with claims totaling approximately $506,000, constitute Critical Vendor Claims based upon the criteria identified above. The Debtors have further determined, after careful consideration of the facts and circumstances, that the Critical Vendor Claims Cap of $125,000 represents the minimum amount that the Debtors believe will suffice to ensure the integrity of their operations on account of the Critical Vendor Claims.

104.    Accordingly, the Debtors seek to prevent disruption to their supply chain and harm to the value of their estates by requesting authority, in their sole discretion, to pay certain Critical Vendor Claims up to the Critical Vendor Claims Cap. The Debtors propose to condition payment to Critical Vendors upon (i) the Critical Vendor's representation to the Debtors, and the Debtors' belief in their business judgment, that the Critical Vendor will experience a severe liquidity crisis absent immediate payment of its prepetition claim; and (ii) the Critical Vendor's

agreement to continue supplying goods and services to the Debtors on terms that are acceptable to the Debtors with an awareness of industry trade terms between the parties.

**F.** **Motion of the Debtors for Entry of an Order (a) Authorizing, but not Directing, the Debtors to (i) Pay Prepetition Claims of Shippers, Warehousemen, and Lienholders And (ii) Pay Tool Makers in the Ordinary Course of Business; and (b) for Related Relief**

105.     As stated above, I strongly believe that it is essential for the Debtors' businesses, and their efforts to maximize value for all creditors, for the Debtors to maintain a reliable and efficient supply and distribution system.  The Debtors' supply and distribution system relies upon: (1) creditors that have or may have possessory liens on the Debtors' goods, such as shippers, warehousemen, third party processors, manufacturers and finishers of the Debtors' goods and capital equipment, repair persons and artisans (collectively, the "Lienholders"), (2) the Debtors' customs brokers and freight brokers (collectively, the "Brokers"), and (3) certain third parties that provide specialized tools, moldings and capital equipment for use in the Debtors' production processes and may have liens on such tools, dies, molds and capital equipment (the "Toolmakers").

106.     Lienholders maintain possession of certain of the Debtors' materials or products in the ordinary course of business.  As of the Commencement Date, many of the Lienholders have claims for (i) storage, (ii) transportation, (iii) manufacturing and repairing tooling, dies, molds, and other capital equipment, and (iv) processing parts necessary for the Debtors' product programs (collectively, the "Lienholder Claims").  Upon information and belief, the Lienholder Claims totaled approximately $1.1 million  as of the Commencement Date.

107.     A portion of the Debtors' business relies on the timely importation of goods and component parts from Mexico, Germany and China, as well as the timely inter-facility delivery of goods between and among the Debtors and their customers.  In addition, from time to time,

certain of the products produced by the Debtors at their domestic locations are sold to foreign customers. Accordingly, in the ordinary course of their business, the Debtors use the services of multiple customs brokers, freight forwarders and third-party logistics coordinators (collectively, the "Brokers") to provide services that enable the Debtors (1) to comply with the complex customs laws and regulations of the United States and other jurisdictions, and (2) to manage the logistics of the Debtors' supply and delivery system by, among other things, auditing invoices of shippers and warehousemen and then billing the Debtors for their services.

108. The Debtors pay the Brokers fees for their services (collectively, the "Broker Fees") and reimburse the Brokers for any funds advanced by the customers to the Brokers on behalf of the Debtors (a) to pay fees to the United States Customs Service (the "Customs Service") relating to work in process or finished goods delivered to or from locations outside of the United States (collectively, the "Customs Duties"), and (b) for charges of certain ocean, air, and land shippers and certain miscellaneous storage and handling expenses (collectively, the "Advances"). As of the Commencement Date, certain of the Brokers had outstanding claims for the payment of Broker Fees, Customs Duties, and/or Advances (collectively, the "Broker Claims"). Upon information and belief, the Broker Claims totaled approximately $30,000 as of the Commencement Date

109. In the ordinary course of business, the Debtors routinely contract with independent tool and die shops (as defined above, the "Toolmakers") for the production of specialized tooling, dies, molds and capital equipment necessary for the Debtors' various production processes (collectively, the "Tools"). At any given time, a number of Toolmakers will be in the process of producing Tools that the Debtors will need to continue existing lines of business or to launch new production programs.

110.    Typically, the Debtors will not become obligated to the Toolmakers until relatively late in the production process, and only after the Tool has passed applicable quality and performance tests.  Indeed, the Debtors usually must take possession of the relevant Tool prior to making payment so that all necessary quality and performance-related tests may be performed.  I believe that certain of the Toolmakers may refuse to deliver new tooling in the future without some assurance by the Debtors of payment for Tools already delivered or to be delivered in the future (the "<u>Toolmaker Claims</u>").  Upon information and belief, the Toolmaker Claims totaled approximately $1.8 million  as of the Commencement Date

111.    I believe that the Lienholders, Brokers and Toolmakers may potentially assert tooling, mechanics', and other possessory and statutory liens against the Debtors' property.  I further believe that, even if certain Lienholders, Brokers and/or Toolmakers ultimately do not hold possessory or statutory liens on the Debtors' property, such Lienholders, Brokers and/or Toolmakers could, by refusing to return, transport, expedite, manufacture or process goods, tools, dies, molds and/or capital equipment in their possession or over which they may exercise control, cripple or halt the Debtors' ability to manufacture and deliver products to their customers.  It is essential to the Debtors' businesses, and to their efforts to maximize value for all creditors, for the Debtors to maintain a reliable and efficient supply and distribution system.  Without timely delivery of key components, the Debtors' customers cannot complete the assembly of the parts and vehicles they sell.  Without the relief requested in this Motion, the Debtors could suffer a significant loss of credibility and customer goodwill and sustain substantial harm to their businesses and their chapter 11 efforts.

112.    I believe that it is essential for the Court to authorize, but not direct, the Debtors to pay Lienholder Claims, Broker Claims and Toolmaker Claims because the Lienholders,

Brokers and Toolmakers, by exercising their state law remedies, or by holding the Debtors' goods, tools, dies, molds and/or capital equipment hostage, can disrupt or shut down the Debtors' production and delivery of product to their customers.

113. Accordingly, the Debtors seek to prevent any potential disruption to their supply and delivery network by requesting the authority, but not the direction, to pay certain of the Lienholder Claims, Broker Claims and Toolmaker Claims, as, in their business judgment, the Debtors determine necessary or appropriate to (a) obtain release of critical or valuable goods, tools, dies, molds and/or capital equipment that may be subject to liens; (b) maintain a reliable, efficient, and smooth distribution system; and (c) induce Lienholders, Brokers and Toolmakers to continue to produce goods, tools, dies, molds and capital equipment, to perform timely transportation, expediting and forwarding services and to make timely delivery. The Debtors propose payment of such claims when, in the Debtors' sole discretion, either (i) the creditor holding such a claim has asserted or may assert a possessory or other state-law created lien on the Debtors' goods, tools, dies, molds and/or capital equipment, or (ii) the creditor holding such a claim, by refusing to timely perform contractual services, could cripple or shut down the Debtors' production or delivery of products to their customers. The Debtors request the foregoing authority subject to a cap of $250,000.

**G. Motion of the Debtors for Entry of an Order Authorizing, but not Directing, the Debtors to Pay Prepetition Claims of Their Foreign Vendor**

114. As stated above, I strongly believe that it is essential for the Debtors' businesses, and their efforts to maximize value for all creditors, for the Debtors to maintain a reliable and efficient supply and distribution system. The Debtors' operations under MPI include MPI's contractual arrangement with Intermex (the "Foreign Vendor"). The Foreign Vendor produces parts for certain of MPI's customers using conventional metal stamping processes. The Foreign

Vendor uses tooling owned by MPI or its customers; however, all other aspects of the operation, including employees, building lease, and nearly all third party contracts, are contracted through the Foreign Vendor on a "cost plus" basis. The Debtors are not organized to do business in Mexico, and the goods and services provided by the Foreign Vendor either cannot be obtained from other sources or cannot be obtained from other sources in sufficient quantity or quality or without significant delays. As such, if these goods and services are not obtained from the Foreign Vendor without interruption, the Debtors likely would not be able to fulfill their obligations to their customers.

115. Upon information and belief, foreign suppliers, particularly those located in developing countries, often have confused and guarded reactions to the U.S. bankruptcy process. For example, many of these entities are unfamiliar (or uncomfortable) with the unique debtor-in-possession mechanism that is at the heart of chapter 11. A debtor seeking to explain the chapter 11 process to a foreign vendor and convince that foreign vendor, particularly the unsophisticated one, to continue shipments post-petition is often greeted with a high degree of skepticism and mistrust. Indeed, I believe that there is a significant risk that the nonpayment of even a single invoice could cause a foreign vendor to stop shipping goods to the Debtors on a timely basis and/or completely sever its business relationship with the Debtors. But even short of that, nonpayment of prepetition claims may cause the Foreign Vendor to utilize extreme caution and adopt a wait-and-see attitude in approaching the unfamiliar territory of chapter 11, resulting in costly delays in the shipment of additional goods. The Debtors can ill afford delays of this nature.

116. If the claims of the Foreign Vendor are not paid, I believe that the Foreign Vendor may take precipitous action against the Debtors based upon an erroneous belief that it is not

subject to the jurisdiction of this Court and, thus, not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.

117.    Payment of the Foreign Claims is also necessary because the Debtors' customers rely heavily on their just-in-time supply chain.  Use of the just-in-time supply method means that the customers intentionally seek to keep little or no excess inventory of the Debtors' products, and they sometimes rely on daily or more frequent shipments of particular products from the Debtors to keep vehicle assembly lines operating.  Indeed, deliveries from the Debtors are often made directly onto the customers' assembly lines, which leaves no margin of error for late deliveries.  Accordingly, the Debtors rely upon frequent, and in many cases, daily shipments of components from the Foreign Vendor to keep their own and their customers' manufacturing facilities operating.

118.    The Foreign Vendor's refusal to ship to the Debtors or their customers could have a catastrophic adverse effect on the Debtors' operations and, particularly, on the ability of the Debtors to maintain a postpetition business-as-usual atmosphere.  In light of the potential for serious and potentially irreparable consequences if the Foreign Vendor does not continue to make uninterrupted and timely deliveries of goods – and the lack of any workable enforcement mechanism against the Foreign Vendor – I believe that payment of the Foreign Claims is essential to avoid costly disruptions to the Debtors' operations and ability to timely and adequately fill customer orders.  Indeed, the amount of the prepetition claims of the Foreign Vendor pales in comparison to the likely damage to the Debtors' businesses and the claims which would be asserted by the Debtors' customers should the Foreign Vendor refuse to ship. Not only would the Debtors' other creditors not be harmed by payment of the Foreign Claims, but such creditors would also in fact benefit from this Court's empowering the Debtors to make

payments to the Foreign Vendor so as to achieve a smooth transition into bankruptcy with minimal disruption to their operations.

119.   I have carefully reviewed the facts and circumstances of the Foreign Vendor, and believe it would be in the best interests of the Debtors, their estates and creditors for the Court to authorize the Debtors, in their sole discretion, to pay the prepetition claims of the Foreign Vendor, but only to the extent necessary, and on such terms and conditions as are appropriate in the Debtors' business judgment, to avoid potential disruption to their businesses and irreparable loss of value to the detriment of the Debtors' estates, stakeholders and reorganization prospects. The Debtors estimate that the maximum amount to be paid to the Foreign Vendor pursuant to such authority is approximately $120,000.

## III.   FINANCING MOTIONS.

**A.   Motion of the Debtors for Entry of an Order (a) Authorizing (i) Continued Use of Existing Cash Management System, (ii) Maintenance of Existing Bank Accounts, and (iii) Continued Use of Existing Business Forms; (b) Waiving Section 345(b) Requirements; and (c) (i) Granting Administrative Priority Status to Postpetition Intercompany Claims and (ii) Authorizing Continued Performance Under Intercompany Arrangements and Historical Practices.**

120.   The Debtors maintain an integrated Cash Management System consisting of numerous accounts, including a concentration account, general accounts, lockboxes and a master disbursement account.  These accounts are part of a cash dominion structure instituted in January 2008 in connection with a forbearance agreement with GECC.

121.   In addition, to streamline the process of paying expenses incurred by certain administrative and management employees on the Debtors' behalf, the Debtors established a debit card account at Comerica Bank (the "Purchasing Card Account") and have provided corporate debit cards to approximately 35 employees for local purchasing activities (the "Purchasing Cards").  Amounts charged to the Purchasing Cards are billed directly to the

Purchasing Card Account, which is replenished by the Debtors as it is depleted, typically on a weekly basis. The Purchasing Card Account is not part of the cash dominion structure.

122.    The Debtors' operating facilities maintain local bank accounts in Ohio, Tennessee, Indiana and Wisconsin (the "Local Accounts"). Each account typically contains less than $2,000, which is used primarily for petty cash needs. Additionally, the Debtors maintain an account set up in connection with the sale of certain of their former subsidiaries (the "Gearing Sale Account"). The Local Accounts and Gearing Sale Account are not part of the cash dominion system; however, the Gearing Sale Account is subject to a control agreement.

123.    The Debtors' businesses and financial affairs require the collection, disbursement, and movement of funds through numerous bank accounts. I understand that the Office of the United States Trustee has established certain operating guidelines for debtors in possession to supervise the administration of chapter 11 cases, including changes to a debtor's cash management system (the "U.S. Trustee Guidelines"). These guidelines require debtors, among other things, to establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes), to close all existing bank accounts and open new debtor-in-possession accounts, to maintain a separate debtor-in-possession account for cash collateral, and to obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and the type of account on such checks.

124.    I believe that enforcement of these guidelines in these chapter 11 cases, however, would severely disrupt, and likely cripple, the ordinary financial operations of the Debtors. Additionally, the U.S. Trustee Guidelines require debtors in possession to obtain a pledge of securities or the purchase of bonds in favor of the United States as protection for the debtor-in-possession bank accounts. This requirement is unnecessary, given the Debtors' cash

-43-

management system, and unduly burdensome on the Debtors' operations. Finally, in the ordinary course of their business, the various Debtors have standing intercompany service arrangements and engage in transactions that result in intercompany claims, and it is essential to the Debtors' business that they be allowed to honor these claims and make intercompany transfers in the ordinary course on a postpetition basis.

125. Accordingly, the Debtors respectfully request authority to continue to use their existing cash management system, existing bank accounts, existing business forms, and investment guidelines, request that this Court waive the requirement for the Debtors' banks to pledge securities or issue bonds in favor of the United States on account of the Debtors' deposits with such institutions, and further request that administrative priority status be granted to their intercompany claims and that they be allowed to continue to perform under intercompany arrangements and historical practices.

126. Being intimately familiar with the Debtors' cash management system and practices, I believe that their continuation is essential to the Debtors' ongoing operations, and thus their chapter 11 efforts. Additionally, I believe that the Debtors' expertise of the Debtors' management team and employees and the sophistication of the Debtors' cash management system and practice are sufficient to protect the Debtors' from risks of loss of the type with the U.S. Trustee's guidelines foresee and seek to avoid.

**B. Debtors' Motion For (I) an Interim Order Scheduling a Final Hearing and (II) Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 Authorizing the Debtors to (A) Obtain Postpetition Financing (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; and (C) Granting Adequate Protection to Prepetition Secured Parties.**

127. It is essential that the Debtors obtain immediate postpetition financing and authority to use Cash Collateral. This relief will enable them to continue their ordinary course,

day-to-day operations, service their customers, and effectuate their chapter 11 goals. I believe that, without immediate access to credit under the DIP Facility and the use of Cash Collateral, the Debtors will not have sufficient liquidity to provide working capital during these chapter 11 cases to provide customers, employees, vendors, suppliers and other key constituencies with confidence that the Debtors have sufficient resources available to maintain their operations in the ordinary course. Absent this new liquidity, I believe that the Debtors' ability to maximize the value of their estates would be jeopardized, and the Debtors would risk the loss of their going-concern value to the direct detriment of all parties in interest.

128.  As of the Commencement Date, the Debtors are indebted to the Prepetition Senior Lenders and Prepetition Junior Lenders in the approximate aggregate principal amount of $79.2 million and to the Prepetition Junior Lenders in the approximate amount of $14.8 million, including issued and outstanding letters of credit and accrued but unpaid interest, costs, fees and expenses. The Debtors have granted the Prepetition Senior Lenders first priority liens in and against substantially all of their assets, in which liens the Prepetition Junior Lenders hold a subordinate interest.

129.  Prior to the Commencement Date, the Debtors engaged in intensive, arm's length negotiations with the Prepetition Agent, resulting in the agreement by the Prepetition Agent and certain of the Prepetition Senior Lenders to provide postpetition financing.

130.  The Debtors request:

- authorization for (a) PPI Sub-Holdings, Inc., MPI International Holdings, Inc., Precision Parts International Services Corp., and Skill Tool & Die Holdings Corp., (the "Borrowers") to obtain up to $2,000,000 in principal amount of postpetition financing (the "DIP Financing") on the terms and conditions set forth in the Motion and the Credit Agreement and Security and Guaranty Agreement, to be dated as of December 12, 2008 (collectively, the "DIP Credit Agreement" and together with all agreements, documents and instruments delivered or executed in connection therewith, as amended,

supplemented or otherwise modified from time to time, the "<u>DIP Credit Documents</u>"), among the Borrowers, PPI Holdings, Inc. ("<u>Holdings</u>") and each of the direct and indirect domestic subsidiaries of each of the Borrowers (such subsidiaries, collectively with Holdings, the "<u>Guarantors</u>"), General Electric Capital Corporation, as administrative agent (in such capacity, the "<u>DIP Agent</u>") for itself and a syndicate of other financial institutions party thereto (collectively, the "<u>DIP Lenders</u>") and the DIP Lenders, and (b) the Guarantors to guaranty the Borrowers' obligations with respect to the DIP Financing;

- authorization for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Credit Documents, to perform such other and further acts as may be necessary or appropriate in connection therewith and to grant the liens and security interests provided for in the DIP Credit Documents;

- authorization pursuant to sections 361, 362 and 363 of the Bankruptcy Code for the Debtors to (a) use the Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), and all other Prepetition Collateral (as defined in the motion) and (b) provide adequate protection to the Prepetition Agent, for the benefit of itself and of the Prepetition Lenders;

- authorization for the DIP Agent to accelerate the Loans and terminate the Commitments under and in accordance with the DIP Credit Agreement upon the occurrence and continuance of an Event of Default;

- authorization to grant liens to the DIP Agent, for its benefit and the benefit of the DIP Lenders, on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under section 549 of the Bankruptcy Code (and, subject to entry of the Final Order and the terms thereof, on the proceeds of any avoidance actions under sections 544, 547, 548 or 550 of the Bankruptcy Code);

- solely upon entry of the Final Order, the waiver by the Debtors of any right to surcharge costs and expenses against the Collateral (as defined in the motion) pursuant to section 506(c) of the Bankruptcy Code;

- to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the proposed interim order (the "Interim Order") attached to the motion (a) authorizing the Borrower, on an interim basis, to borrow under the DIP Agreement up to $750,000 in principal amount of Loans to be used for working capital and general corporate purposes of the Debtors, (b) granting liens, claims and other rights to the DIP Agent and the DIP Lenders, (c) authorizing the Debtors to use the Cash Collateral (as defined in the motion) and the other Prepetition Collateral, and (d) granting adequate protection to the Prepetition Agent for the benefit of itself and the Prepetition Lenders; and

- to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the Borrower on a final basis to continue to use the Cash Collateral and the other Prepetition Collateral, to borrow the balance of the Loans under the DIP Credit Agreement, to grant liens, claims and other rights to the DIP Agent and the DIP Lenders, and to grant adequate protection on a final basis to the Prepetition Agent for the benefit of itself and the Prepetition Lenders, and authorizing and approving the other relief requested in the motion to become effective pursuant to the Final Order.

131. I believe that, absent the protections and liens proposed to be granted in the Interim and Final Orders, the Debtors would be unable to obtain credit. It is my further belief that no other lender would have been willing to make a postpetition loan on an unsecured basis or on a junior lien basis in an amount necessary for the Debtors' business operations and other financing needs.

132. In addition, I do not believe that it would have been possible to obtain post-petition financing that primed the Prepetition Senior Lenders on a non-consensual basis from a lender or group of lenders that had no relationship to the Prepetition Senior Lenders.

133. The Debtors were thus not able to obtain credit from the DIP Agent, the DIP Lenders, or any other party, on a solely unsecured or administrative priority basis. Therefore, I believe that the terms of the proposed DIP Agreement are fair and reasonable in that they provide protections to the DIP Agent and the DIP Lenders, as well as the Debtors' prepetition secured lenders while providing the Debtors critical access to crucial liquidity and that they are also comparable to similar debtor-in-possession financing facilities.

134. I believe that, because the DIP Agent and the DIP Lenders are familiar with the Debtors, their operations, and their financing structure, the proposed DIP Agreement presented the best financing available to the Debtors.

135. If entry of the Interim Order or the Final Order is denied or delayed, I believe that the Debtors will likely experience business disruptions in the short term, which will diminish

stakeholder confidence and may irreparably damage the value of the Debtors' estates. Without immediate access to Cash Collateral and new borrowing relief, I believe that the Debtors' business operations would grind to an almost immediate halt, which would seriously jeopardize, and might destroy, the going-concern value of the Debtors' businesses. The new liquidity under the proposed interim portion of the DIP Facility will ensure that the Debtors can make the payments requested by the various pleadings discussed herein, pay the administrative claims incurred in the ordinary course of these chapter 11 cases and instill confidence in the Debtors' stakeholders.

136. I believe that the requested interim availability under the DIP Facility will help provide assurances to the Debtors' suppliers, vendors and employees that they will be paid for postpetition services and to the Debtors' customers that the Debtors will be able to deliver products during these chapter 11 cases. In my opinion, these assurances are essential to the Debtors' efforts to persuade their vendors to continue shipping goods and providing services to the Debtors on customary trade credit. Thus, it is clear to me that approval of interim borrowing under the DIP Facility is crucial to maximizing the value of the Debtors' estates.

**[Remainder of Page Intentionally Left Blank]**

#10312544 v9

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the forgoing is true and correct to the best of my knowledge, information, and belief, after reasonable inquiry.

Dated: <u>December 12</u>, 2008

PPI Holdings, Inc.; International Fineblanking Corporation; MPI International Holdings, Inc.; MPI International, Inc.; Michigan Fineblanking, Inc.; PPI Sub-Holdings, Inc.; Precision Parts International Services Corp.; Skill Tool & Die Corp.; Skill Tool & Die Holdings Corp.

Roger Goldbaum
Chief Financial Officer

#10312544 v7