# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PPI HOLDINGS, INC., <u>et</u> <u>al.</u>,[1] | ) Case No. 08-13289 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Proposed Obj. Deadline (Bidding Procedures): 1/13/09 at 4:00 p.m. (ET)** |
| | ) **Proposed Hearing Date (Bidding Procedures): 1/14/09 at 1:00 p.m. (ET)** |
| | ) **Proposed Sale Obj. Deadline: 2/4/09 at 4:00 p.m. (ET)** |
| | ) **Proposed Sale Hearing Date: 2/11/09 at 2:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE: (A) APPROVING BIDDING PROCEDURES; (B) SCHEDULING AN AUCTION; (C) APPROVING AN EXPENSE REIMBURSEMENT FEE BID PROTECTION TO A STALKING HORSE BIDDER; (D) SCHEDULING A SALE HEARING; (E) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (F) APPROVING THE DEBTORS' PROPOSED SALE OF <u>SUBSTANTIALLY ALL OF THEIR ASSETS</u>

The above-captioned debtors as debtors and debtors-in-possession (the "<u>Debtors</u>"), by this motion (the "<u>Motion</u>"), seek entry of an order (A) approving bidding procedures; (B) scheduling an auction; (C) approving an expense reimbursement fee bid protection to a stalking horse bidder; (D) scheduling a sale hearing; (E) approving the assumption and assignment of certain executory contracts and unexpired leases; and (F) approving the Debtors' proposed sale of substantially all of their assets, free and clear of all liens, claims, interests and encumbrances. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these proceedings are: PPI Holdings, Inc.; International Fineblanking Corporation; MPI International Holdings, Inc.; MPI International, Inc.; Michigan Fineblanking, Inc.; PPI Sub-Holdings, Inc.; Precision Parts International Services Corp.; Skill Tool & Die Corp.; Skill Tool & Die Holdings Corp.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtors' chapter 11 cases and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.    The statutory predicates for the relief requested herein are sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 - 1532 (the "Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

3.    On December 12, 2008 (the "Commencement Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

4.    An official committee of unsecured creditors was appointed on December 23, 2008.

5.    Reference is made to the Declaration of Roger Goldbaum, Chief Financial Officer of the Debtors, in Support of First Day Motions [Docket No. 4], for a description of the Debtors' businesses, capital structure, and the circumstances leading to the chapter 11 filings.

## RELIEF REQUESTED

6.    As described above, the Debtors desire to proceed with a sale process for the sale of all or substantially all of the Debtors' assets, consisting of a single sale or combination of sales, free and clear of all liens and interests with those liens and interests attaching to the proceeds of

the sale with the same priority as existed prior to the sale. The Debtors seek authority to enter into this sale process either with or without a "stalking horse" bidder.[2]

7. By this Motion, the Debtors seek the entry by this Court of two (2) orders:

(a) first, an order (the "Bidding Procedures Order") to be considered at a hearing to approve the procedural relief requested in this Motion (the "Bidding Procedures Hearing"), providing for a process for interested bidders to submit offers with respect to the Assets (as defined in the Bidding Procedures, attached hereto as Exhibit A, as follows):

i. approving the form and manner of notice of this Motion and the relief requested herein;

ii. setting a deadline and approving requirements and procedures for interested parties to submit bids for the Assets (the "Bidding Procedures"), including the approval of up to $100,000 in expense reimbursement (the "Expense Reimbursement") to be paid in the Debtors' discretion to a "stalking horse" purchaser, if one is secured prior to the Auction (the "Stalking Horse Buyer"), from the proceeds of any transaction approved by the Court to a purchaser other than the Stalking Horse Buyer (an "Alternative Transaction");

iii. scheduling an auction (the "Auction") of the Assets;

iv. approving the form and manner of notice and establishing deadlines related to cure amounts proposed in connection with the possible assumption and assignment of executory contracts and unexpired leases; and

v. setting a final hearing date (the "Sale Hearing") to approve the sale of all or any portion of the Assets to the bidder (the "Successful Bidder") submitting the highest or otherwise best offer (the "Successful Bid") acceptable to the Debtors.

(b) second, to the extent that the Debtors determine a bid to purchase the Assets to be a Successful Bid, the Debtors will request entry of an order (the "Sale Order"):[3]

---

[2] In the absence of a stalking horse bidder, the Debtors intend to file, on or before January 16, 2009, as a supplemental exhibit to this motion, a general form of asset purchase agreement against which bidders may mark their bids.

[3] The Debtors will file their proposed Sale Order not less than 10 days prior to the deadline for objections to the sale.

i.      authorizing and approving the Successful Bid on substantially the terms and conditions set forth in an asset purchase agreement to be filed as a supplemental exhibit to this Motion, as such agreement may be modified at or prior to the Auction (the "<u>Asset Purchase Agreement</u>");

ii.      authorizing (i) the sale of substantially all of the Debtors' assets including, but not limited to, the certain real and personal property described in the Asset Purchase Agreement and the Bidding Procedures (collectively, the "<u>Assets</u>"), to the Successful Bidder on substantially the terms and conditions set forth in the Asset Purchase Agreement, as the same may be modified in such Successful Bid, with such sale to be free and clear of all liens, claims, interests and encumbrances, with such liens, claims, interest and encumbrances attaching to the proceeds of the sale with the same validity and priority as existed prior to the sale and (ii) the Successful Bidder's assumption of certain liabilities, subject to the terms of the Asset Purchase Agreement and the Sale Order;

iii.      authorizing assumption by the Debtors and assignment to and assumption by the Successful Bidder(s) of the Assigned Contracts (as defined below), to the extent provided in the Successful Bid(s);

iv.      authorizing relief consistent with the foregoing in connection with any party submitting the highest and/or best offer for the Assets at the Auction in accordance with the Bidding Procedures; and

v.      authorizing the Debtors to consummate all transactions related to the above.

## THE PROPOSED SALE OF THE DEBTORS' ASSETS

**A.**      <u>The Need for Immediate Action</u>

8. Debtors have post-petition financing and are able to operate. However, the post-petition financing terminates on March 2, 2009, and the financing order provides for liquidation of Debtors' Assets (which the Debtors seek to effectuate on a going-concern basis). The Debtors' management believes that the immediate sale of the Debtors' operating businesses, as contemplated by this Motion, is critical to preserving the value of such businesses for the benefit of all creditors and stakeholders. Additionally, the Secured Lenders support the sale of all or

substantially all of the Debtors' Assets. Without an immediate sale, under current economic conditions, the Debtors will be unable to continue to operate their business and will be forced to close, causing economic harm to all creditors and resulting in a significant loss of jobs.

**B.      The Debtors' Marketing Efforts**

9.      In December 2007 the Debtors commenced the process of locating a purchaser for one of their businesses, Precision Gear Holdings, Inc ("Precision Gear"). That process was successful, and on June 2, 2008, the Debtors closed on the sale of substantially all of the assets of Precision Gear.

10.      During 2008 the Debtors also attempted to locate a purchaser for another of the Debtors' businesses, Skill Tool & Die Holdings Corp. ("Skill"). Four prospective purchasers executed confidentiality agreements with respect to the purchase of Skill. Although the Debtors have engaged in extensive negotiations with one of the prospective purchasers, both before and after commencement of these chapter 11 cases, they have not yet been able to secure a definitive agreement for the sale of Skill's assets.

11.      Subsequent to the filing of these chapter 11 cases, the Debtors have sought or will seek to retain the investment banking firm Rothschild Inc. ("Rothschild") to assist the Debtors in locating a purchaser for substantially all of their assets. With the assistance of Rothschild, the Debtors have contacted fifty two (52) potential buyers, thirteen (13) of which have signed confidentiality agreements. The Debtors are currently negotiating with three prospective buyers, and anticipate engaging in negotiations with additional prospective buyers in the near future. However, no prospective buyer has executed an asset purchase agreement.

12.      The Debtors have established a data room consisting of information needed by prospective purchasers to conduct due diligence necessary to submit a potential offer to

purchase. Access to the data room shall be available to all prospective purchasers upon execution of an appropriate confidentiality agreement.

## C.   Assets to Be Sold

13. The Assets to be sold, together or separately, to one or more bidders, are substantially all of the assets of the Debtors, including without limitation:

(a)   Real Estate.  Fee simple title to each of the Debtors' owned facilities, together with all improvements, tenements, hereditaments and appurtenances belonging or pertaining in any way thereto (the "Real Estate"), free and clear of liens, excluding permitted encumbrances.

(b)   Inventory.  All inventories (a) which in the ordinary course of the Debtors' business are held for sale or lease or are to be furnished under contracts of service or consumed in the business, or (b) which are raw materials, work-in-process, finished goods, packaging materials and all other similar materials and supplies (including, without limitation, tooling inventory) in each case used or usable in connection with the manufacture, processing, servicing, selling, leasing or furnishing of such goods and any constituents or parts thereof (the "Inventory")

(c)   Other Tangible Assets.  All of the Debtors' tangible assets used in the business, including but not limited to the following:  All of the Debtors' owned furniture and equipment, which shall include all tooling, cranes, presses, welders, fixtures, machinery, and computer hardware (together with software used in connection with the business) and other equipment necessary to conduct the business, and all of the Debtors' interests in any assets subject to leases that are included in the Assumed Contracts, and all of the Debtors' interest in items owned by third parties (including but not limited to tooling).

(d)   Assumed Contracts.   All of the Debtors' rights in and to assumed executory contracts and unexpired leases, each of which shall be assumed by the Debtors in the Bankruptcy Proceedings and assigned by the Debtors to, and assumed by, the purchaser at the closing of the sale.

(e)   Intellectual Property.  All of the Debtors' interest in intellectual property used by the Debtors in the business.

(f)   Other Intangible Property.  All of the Debtors' other intangible property, including without limitation:  manufacturers' warranties and/or vendors' warranties (to the extent permitted by law) and all claims relating to the Assets (without recourse against the Debtors); all right, title and interest in all governmental and material non-governmental licenses and permits

required to conduct the business, including but not limited to any software licenses required to operate the equipment; <u>excluding</u>, <u>however</u>, any causes of action arising under Chapter 5 of the Bankruptcy Code.

(g)     <u>Business Records</u>.  Originals of all of the Debtors' employment and personnel records, customer contract files, drawings, part specifications, CAD/CMM data, and Production Part Approval Process (PPAP) and part submission warrant documents, and copies of all OEM purchase orders, a complete history of each current model service production contracts and such other information as would be necessary or required to continue the production contemplated with the Debtors' customers, books and records relating or pertaining to the business, including all sales records and similar data, together with all building surveys, drawings, specifications and construction, installation, testing and maintenance documents pertaining to the Assets (collectively the "<u>Business Records</u>"); <u>provided</u>, <u>however</u>, that for a period of three (3) years from the Closing, the purchaser shall provide access to the Debtors to such originals during normal business hours.  <u>Provided</u> <u>further</u>, although the purchaser shall maintain the Business Records during such three (3) year period (or such shorter period as may be agreed to by the purchaser and the Debtors) in a manner consistent with how the purchaser maintains its own business records, the purchaser will have no liability if any of the Business Records are destroyed or damaged.

The sale of the Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or estates, except to the extent set forth in the Asset Purchase Agreement of the Successful Bidder(s) (as defined herein) as approved by the Bankruptcy Court. Except as otherwise provided in such approved purchase agreements, all of the Debtors' right, title and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances thereon and there against (collectively, the "<u>Liens</u>"), such Liens to attach solely to the net proceeds of the sale of such Assets.

## D.     <u>Local Rule 6004-1 Disclosure of Proposed Bidding Procedures</u>

14.     In an effort to ensure that the highest value is obtained for the Assets, the Debtors propose that the Bidding Procedures, which are most likely to maximize the value of the Assets, shall govern the submission of bids for the Assets.  In accordance with Local Rule 6004-1, the Bidding Procedures are summarized as follows:

(a)     **Due Diligence**:  The Bidding Procedures permit all potential bidders to participate in the due diligence process prior to the Bid Deadline.

-7-

(b)    **Bid Deadline**:  The Bidding Procedures provide for a bid deadline of February 6, 2009 at 4:00 p.m. (prevailing eastern time).

(c)    **Qualification of Bidders**:  To be eligible to participate in the Auction, a potential bidder must be a "Qualified Bidder".  A Qualified Bidder is a person or entity:

    i.      who has delivered to Debtors an executed confidentiality agreement(s) in form and substance acceptable to Debtors;

    ii.     who has delivered to Debtors on or before the Bid Deadline (as defined herein) a bid that meets the criteria for a Qualified Bid (as defined herein), accompanied by a cover letter from such person or entity stating that (i) the bidder is prepared to enter into and consummate the transactions in accordance with the terms of the Modified APA (as defined herein) submitted by the bidder, after approval by the Bankruptcy Court, (ii) the bidder's appearance at the Auction will constitute a waiver of any due diligence or financing contingencies of any kind contained in the Modified APA submitted by the bidder, and (iii) such bidder's offer is irrevocable until the date that is the earlier of twenty (20) days after the conclusion of the Sale Hearing with respect to the Assets or the closing of the Debtors' sale of the Assets to another purchaser.

    iii.    who has delivered to the Debtors on or before the Bid Deadline such financial and other information as will allow the Debtors to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA, including, without limitation, financial and other information setting forth adequate assurance of future performance under section 365 of the Bankruptcy Code (if applicable), and evidence of debt and/or equity funding commitments or other financial resources readily available and sufficient in the aggregate to finance the purchase of the Assets, in a form requested by and reasonably satisfactory to the Debtors;

    iv.    who possesses the financial capabilities, business plan and management structure to effect the acquisition of and operation of the Debtors' manufacturing plants in the reasonable business judgment of the respective Customer; and (b) would agree to assume the Customers' purchase orders with Debtors without modification, or on other terms acceptable in its absolute discretion to the respective Customer; and

    v.     whose financial information and credit-quality support demonstrate a financial capability to consummate the purchase of the Assets

-8-

and whom the Debtors in the good faith exercise of their business judgment determine is reasonably likely (based on availability of financing, experience and other considerations) to be able to consummate a transaction if selected as the Successful Bidder

(d)    **Qualified Bids**:  To be considered a Qualified Bid, a bid:

i.    must be submitted by February 6, 2009 at 4:00 p.m.;

ii.    may be for less than all of the same Assets proposed to be acquired by the Stalking Horse Bidder;

iii.    must provide a purchase price for the Assets that exceeds the purchase price for such Assets reflected in the Stalking Horse APA (as defined below), if any, by at least six (6) percent;

iv.    must provide that the entire purchase price will be paid in cash at closing;

v.    must identify with particularity each executory contract and unexpired lease, the assumption and assignment of which is a condition to closing;

vi.    shall not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

vii.    must fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

viii.    shall not contain any due diligence or financing contingencies of any kind that such bidder is not prepared to waive prior to the Auction;

ix.    must include evidence of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified APA (as defined in the Bidding Procedures);

x.    must be accompanied by a good faith cash deposit equal to ten percent (10%) of the amount offered to purchase the Assets; and

xi.    must be accompanied by clean and blacklined versions of a form of Sale Order of which the bidder would request approval at the Sale Hearing.  The blacklined copy shall show the differences between the proposed Sale Order filed by the Debtors (or, if a revised form of proposed Sale Order has been filed with the

Stalking Horse APA, such revised proposed Sale Order) and the bidder's proposed Sale Order.

xii. The Debtors reserve the right, in their discretion, to waive any of the foregoing requirements and to deem a bid as a Qualified Bid.

(e) **Auction**:  The Debtors intend to solicit competitive bidding prior to the Auction, without any restrictions.  An Auction of the Sale Assets is contemplated.  If two or more Qualified Bids are received by the Debtors (including a Qualified Bid by a Stalking Horse Bidder), an Auction shall be held on February 10, 2009 at 10:00 a.m. (prevailing eastern time) at the offices of Pepper Hamilton, LLP at The New York Times Building, 37th Floor, 620 Eight Avenue, New York, NY 10018-1405 or such other time or other place as the Seller shall notify all Qualified Bidders who have submitted Qualified Bids with respect to the Assets subject to Auction. The Auction will be conducted openly and all creditors will be permitted to attend.

Each bidder participating at the auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

At the Auction, Qualified Bidders will be permitted to increase their bids (such increased Qualified Bid, a "Qualified Overbid"), provided that such Qualified Overbid(s) shall exceed the highest existing bid by at least one hundred thousand dollars ($100,000).

The Auction shall not conclude until each Qualified Bidder has had the opportunity to submit thereat a Qualified Overbid with full knowledge of the existing highest bid.

The bidding at the Auction will be transcribed.

(f) **Stalking Horse Bidder and Bid Protections**:  On or before January 30, 2009, the Debtors in their discretion may execute and file with the Court, as a supplemental exhibit to the Sale Motion, subject to Court approval pursuant to the Sale Motion, a fully-executed Asset Purchase Agreement for the sale of the Assets to a bidder (the "Stalking Horse Bidder") whom the Debtors reasonably determine, after consultation with GECC, the Committee and the Customers, to have the financial and other capabilities to consummate the transactions contemplated by the Sale Motion, on terms acceptable to the Debtors (a "Stalking Horse APA").  The Stalking Horse Bidder shall be deemed to be a Qualified Bidder for purposes of participation in the Auction, and the Stalking Horse Bid shall be deemed to be a Qualified Bid for purposes of the Auction.

In order to induce a Stalking Horse Bidder to execute a Stalking Horse APA, and provided that the Stalking Horse APA does not contain any due

diligence or financing contingencies of any kind, the Debtors shall be authorized to provide bid protections to the Stalking Horse Bidder in the Stalking Horse APA in the form of an expense reimbursement fee of up to $100,000 (the "Expense Reimbursement Fee"), to be paid at closing from the proceeds of the sale of the Assets to a competing bidder if the Assets are not sold to the Stalking Horse Bidder. The Bidding Procedures permit the Stalking Horse Bidder to credit bid the Expense Reimbursement Fee at the Auction.

(g) **Sale to an Insider:** The Debtors have not yet identified the prospective purchasers. Atlantic Equity Partners III, L.P., an insider of PPI within the meaning of section 101(31) of the Bankruptcy Code, has expressed an intent to participate in the bidding process.

(h) **Releases**: No releases have been entered into or are presently contemplated in connection with the Sale. It is possible, however, that a Stalking Horse Agreement or Modified APAs (as defined in the Bidding Procedures) submitted to the Debtors in connection with the Auction could contain release provisions. The existence of any such releases will be considered in evaluating bids and, if included in a Stalking Horse Bid or a Successful Bid, will be disclosed to the Court.

(i) **Closing and Other Deadlines**: An Auction date of February 10, 2009 is contemplated. As soon as practicable after the conclusion of the Auction or, if no other Qualified Bids are received by the Bid Deadline, then as soon as practicable after the Bid Deadline, the Debtors shall review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the Bidding Process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and identify the highest and/or otherwise best offer (the "Successful Bid") for the Assets and the bidder, (the "Successful Bidder") making such bid.

A Sale Hearing date of February 11, 2009 has been requested. Closing is anticipated as soon as practicable following Court approval of a sale.

(j) **Closing with Alternative Backup Bidder**: Following the Sale Hearing, if any such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid or Qualified Overbid with respect to such Assets as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid with respect to such Assets and the Seller shall effectuate such sale without further order of the Bankruptcy Court.

(k) **Use of Proceeds**: At closing, the Debtors propose to use the Sale proceeds to pay the expenses required to be paid to complete the transaction, with

the net proceeds to be paid to the Senior Lenders pursuant to the terms of the DIP Financing Agreement.

(l) **Tax Exemption**: No tax exemptions under section 1146(a) of the Bankruptcy Code are contemplated in connection with the Sale.

(m) **Record Retention**: The Debtors will retain, or have reasonable access to, their books and records to enable them to administer these bankruptcy cases.

(n) **Sale of Avoidance Actions**: The Sale does not involve the sale of any chapter 5 causes of action.

(o) **Requested Findings as to Successor Liability**: The Asset Purchase Agreement will provide that Purchaser is not assuming any of the Debtors' Liabilities, except to the extent expressly provided therein, and the Sale Order should decree that the Successful Bidder shall have no liability for successor liability claims.

(p) **Sale Free and Clear of Liens and Interest**: The Debtors are seeking to sell the Assets free and clear of all liens, claims and encumbrances, with liens, claims and encumbrances to attach to the proceeds of sale in the order of their existing priority.

(q) **Relief from Bankruptcy Rule 6004(h)**: The Debtors are requesting relief from the ten (10)-day stay imposed by Rule 6004(h).

(r) **Reservation of Rights**:  The Debtors reserve all rights to terminate the sale process at any time if the Debtors determine, in their business judgment, that the sale process will not maximize the value of their bankruptcy estates.  Termination of the sale process shall be subject to payment of the Expense Reimbursement.  In addition, the Debtors reserve all rights not to submit any bid which is not acceptable to the Debtors for approval to the Bankruptcy Court.  The Debtors shall further have the right to amend the Bidding Procedures or impose such other terms and conditions with respect to the Bidding Procedures which the Debtors determine, in their business judgment, are necessary for them to fulfill their fiduciary duties provided that such modifications are not inconsistent with any Bankruptcy Court order, including the Bidding Procedures Order.

## ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND PROCEDURES RELATING TO SAME

15.    The Debtors further seek authority, effective upon the Closing, to assume and

assign to the Successful Bidder(s), pursuant to sections 363 and 365 of the Bankruptcy Code,

certain executory contracts and/or unexpired leases that will be identified on a Schedule annexed to the asset purchase agreement(s) ultimately submitted by the Successful Bidder(s) (the "Assigned Contracts").  Under such asset purchase agreement(s), the Debtors and the Successful Bidder(s) will agree on what portion of the assumed Cure Amounts are to be paid by the Debtors from the proceeds of the Sale, and what portion of such amounts is to be paid by the Successful Bidder(s).

16.      On or before January 19, 2009, the Debtors will file, as a supplemental Exhibit B to this Motion, a schedule of the executory contracts and unexpired leases that the Debtors may seek to assume and assign as part of the proposed Sale.  The absence if any executory contract or unexpired lease from supplemental Exhibit B shall not preclude the Debtors from subsequently seeking authorization for the assumption and assignment of such contracts, whether to the Successful Bidder or otherwise.  Moreover, nothing in this Motion shall require the Debtors to assume and assign any executory contracts or unexpired leases listed on such supplemental Exhibit B.

17.      To facilitate the orderly sale of the Assets, the Debtors respectfully requests that the Court approve the following Assumption and Assignment Procedures:

(a)      First, within two (2) business day after the Court enters the Sale Procedures Order, the Debtors will serve on the counterparties to contract or leases that may be assigned a Notice of Proposed Assumption and Assignment of Executory Contracts and Leases (the "Assumption and Assignment Notice"), in the form attached as Exhibit 2 to the proposed Bidding Procedures Order.  The Assumption and Assignment Notice will advise these counterparties that their contract or lease may become an Assigned Contract, and will include any cure amounts associated with the assumption and assignment of the Assigned Contract (the "Proposed Cure Amount").

(b)      Second, any counterparty to a contract or lease who objects to the assignment to the Successful Bidder(s) or disputes the Proposed Cure Amount must file an objection stating the basis, including the nature of any dispute over the Proposed Cure Amount.  The Debtors propose that

any such objections be due on <u>February 4, 2009 at 4:00 p.m. (prevailing Eastern Time)</u>.

(c)     Third, at the Sale Hearing the Debtors and Successful Bidder(s) shall have the burden of establishing that the requirements under sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code regarding adequate assurances of future performance are satisfied. Because the Debtors do not know the identity of the Successful Bidder(s), the Assumption and Assignment Notice provides that the Assigned Contracts will be assigned to the Successful Bidder(s), whose identities are currently unknown. In the best of circumstances the Debtors would have identified the Successful Bidder(s) in the Assumption and Assignment Notice; however, given the timing of the scheduled closing, it is not possible to wait until the conclusion of the Auction to serve counterparties with an assumption and assignment and cure notice. In any event, the Debtors believe that a Sale to any Successful Bidder(s) would be in the best interest of the counterparties to Assigned Contracts, as the counterparties in that case will have a party with whom to do business.

## BASIS FOR RELIEF

**A.     The Proposed Sale is in the Best Interests of the Debtors, Their Creditors and Their Estates**

18. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1107(a). Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

19. The courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor. *See e.g. In re Trans World Airlines, Inc.*, Case No. 01-00056, 2001 WL 1820326, at *11 (Bankr. D. Del. April 2, 2001); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward*

-14-

*Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a *good business reason* for completing the sale and the transaction is in good faith.") (emphasis added).

20. Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted the sale of all or substantially all assets of a debtor outside the ordinary course of business if the proposed sale satisfies the following:  (a) a sound business justification exists for the sale; (b) adequate and reasonable notice of the sale was given to interested parties; (c) the sale will provide a fair and reasonable price for the property; and (d) the parties have acted in good faith.  *See Delaware & Hudson Ry. Co.*, 124 B.R. at 176; *Phoenix Steel*, 82 B.R. at 335-36.

21. A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See, e.g., In re Abbotts Dairies of Pennsylvania*, 788 F.2d 143 (3d Cir. 1986); *Cmte. of Equity Security Holders v. The Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983).  In fact, the paramount goal in any proposed sale of property is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *The Official Committee of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)* 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greater overall benefit

possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

22. Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. *See In re Montgomery Ward Holding Corp.*, Case No. 97-1409 (PJW) (Bankr. D. Del. Aug. 6, 1997); *In re Fruehauf Trailer Corp.*, Case No. 96-LS63 (PJW) (Bankr. D. Del. Feb. 26, 1997); *In re Integrated Res.*, 147 B.R. at 659 (such procedures are created to "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

23. The Debtors submit that the sale to any Successful Bidder satisfies the "sound business reason test" and represents a prudent and proper exercise of the Debtors' business judgment. The Debtors believe that a prompt sale of the Assets presents the best opportunity to maximize their value for the Debtors' estates. The Debtors also believe that, absent a prompt sale, the value of the Assets may substantially decline. A variety of reasons support the Debtors' decision to market and sell the Assets at this time including the fact that Debtors will not have the critical funds to continue their operations. Without an immediate sale, the value of the Assets may decrease dramatically, to the detriment of the Debtors secured and unsecured creditors. *Id* at 24.

24. The Debtors believe that the Bidding Procedures are the best method by which they can obtain the best price for the Assets and provide interested persons with accurate and reasonable notice of the Proposed Sale. The Bidding Procedures will allow the Debtors to

conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction, thereby increasing the likelihood that the Debtors will receive the best possible purchase price for the Assets. The Bidding Procedures also will enable the Debtors to undertake the auction process in as expeditious a manner as possible, which the Debtors believe is essential to maintaining and maximizing the value of their estates.

**B.      The Proposed Bidding Procedures are in the Best Interests of the Debtors, their Creditors and the Estates**

25. The Bidding Procedures outlined herein are designed to invite competitive bids. The Bidding Procedures are fair, reasonable and necessary to promote the highest or best sale price, without imposing undue obstacles to the competitive bid process.

26. Sellers of assets often employ termination or break-up fees and other bidding protections in order to encourage the making of bids. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *Integrated Res.*, 147 B.R. at 650. Break-up fees take many different forms, including paying the out-of-pocket expenses incurred by a bidder in arranging the deal, including due diligence expenses, or compensating a bidder for its lost opportunity costs. *See In re Hupp Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992).

27. Outside the bankruptcy context, courts commonly approve break-up fees. Such fees are presumptively appropriate under the business judgment rule[4] and non-bankruptcy courts rarely rule on their propriety. *See, e.g., Cottle v. Storer Communications, Inc.*, 849 F.2d 570

---

[4]      Under the business judgment rule, absent evidence of self-dealing or plain excessiveness, a board's decision to agree to a break-up fee would be presumed to be a valid exercise of its business judgment and would be approved.

(11th Cir. 1988); *CRTF Corp. v. Federated Dep't. Stores*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Indus.*, 663 F. Supp. 614 (S.D.N.Y. 1987).

28. Agreements to provide breakup fees or reimbursement of fees and expenses in the bankruptcy context are meant to compensate the potential acquirer who serves as a catalyst or "stalking horse" which attracts more favorable offers. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (the assurance of a break-up fee may promote "more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."); *In re Homelife Corp.*, Case No. 01-2412 (EIK), 2002 WL 31115654, at *2 (Bankr. D. Del. 2002) (stalking horse bid benefited Debtors' estates by stimulating bidding by more than one bidder and encouraging other bidders to make their best offers.).

29. In the bankruptcy context, the test for determining whether bidding incentives, including a break-up fee, should be approved is whether such incentives are actual and necessary expenses of the estate. *See O'Brien*, 181 F.3d at 533; *S.N.A Nut Co.*, 186 B.R. at 104; *see also In re Am. West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *Hupp Indus., Inc.*, 140 B.R. at 194. Courts have identified at least two instances in which bidding incentives provide benefits to an estate and thus constitute actual and necessary expenses. First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine*, 181 F.3d at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

30. The Expense Reimbursement is necessary for the Debtors attempt to secure a stalking horse buyer prior to the Auction. As such, the assurance of the Expense Reimbursement (i) promotes competitive bidding because it could induce a bid from a stalking horse buyer that might otherwise not have been made and (ii) compensates the stalking horse buyer for the intensive analysis, due diligence investigation, and negotiation undertaken in connection with any potential sale. A potential buyer should be reasonably compensated for its willingness to assume the role of the "stalking horse." As such, the implementation of the fees explained above should be deemed a valid exercise of the Debtors' business judgment.

31. In addition, the Break-up Fee is fair reasonable in relation to the aggregate consideration offered under the Asset Purchase Agreement. The Break-up Fee is also consistent with break-up fees approved in other cases. *See*, *e.g.*, *In re Am. Classic Voyages Co.*, Case No. 01-10954 (EIK) (Bankr. D. Del. Mar. 20, 2002) (approving break-up fee of 6.67%, or $250,000 in connection with a $3.75 million sale); *In re Icing Inc.*, Case No. 950512 (PJW) (Bankr. D. Del. Dec. 26, 1995) (approval of $200,000 breakup fee on approximate purchase price of $2.2 million, equaling 9.09% of the purchase price); *In re Parmalat USA Corp.*, Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2004) (bidding procedures including a break-up fee in the amount of $600,000 and expense reimbursement of $300,000, together equaling 4.5% of the proposed purchase price). Here the Break-Up Fee constitutes only about 3% of the purchase price.

32. The other Bidding Procedures are a necessary tool to maximize the value of the Debtors' estates and will not unduly hamper the submission of competing bids. Rather, the other Bidding Procedures will insure that only parties with a serious and legitimate interest in acquiring the Assets will participate in an open Auction process.

33. For the foregoing reasons, the Debtors respectfully submit that this Court should authorize and approve the Bidding Procedures, including the Expense Reimbursement, pursuant to section 503 of the Bankruptcy Code.

**C.      The Assumption and Assignment of the Assigned Contracts Should Be Authorized**

34. Under section 365(a) of the Bankruptcy Code, a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  In turn, section 365(f)(2) of the Bankruptcy Code provides in pertinent part:

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)      the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)      adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

35.      Section 365(b)(l) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  This subsection provides:

> (b)(l) if there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)      cures, or provides adequate assurance that the trustee will promptly cure, such default
>
> (B)      compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)      provides adequate assurance of future performance under such contract or lease.  11 U.S.C. § 365(b)(l).

36.      As set forth above, the Debtors will propose a cure amount, if any, under each of the Assigned Contracts.  To the extent that there is a dispute over a Proposed Cure Amount, the

-20-

Debtors will either cure such defaults prior to Closing or establish such reserve for payment of cure costs as the Court may direct.

37.     Moreover, the Debtors submit that any proposed Sale will provide all parties to the Assigned Contracts with adequate assurance of future performance.   The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr.  S.D.  Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr.  D.N.J. 1988).

38.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph.  Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

39.     If necessary, the Debtors will produce facts at the hearing on this Motion to support the proposed purchaser's willingness and ability to perform under the Assigned Contracts.   The hearing will thus provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the proposed purchaser to provide adequate assurance of future performance under the Assigned Contracts, as required

under section 365(b)(1)(C) of the Bankruptcy Code. The Court should therefore authorize the Debtors to assume and assign the Assigned Contracts as set forth herein.

**D.   Relief from the Ten Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate.**

40.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property.. . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease. . .is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtors respectfully requests that the Sale Procedures Order be effective immediately by providing that the ten (10) day stay periods under Bankruptcy Rules 6004(h) and 6006(d) are waived.

41.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, a leading treatise suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 <u>Collier on Bankruptcy</u> 15th Ed. Rev., 6064.09 (15th rev. ed. 1988). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>..

42.     The Debtors hereby request that the Court waive the ten-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the lesser alternative, if an objection to the Sale is

overruled and the objector advises the Court of its intention to file an appeal, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal

## NOTICE AND PRIOR MOTIONS

### A.    Proposed Notice Procedures

43.    Notice of this Motion, and the Motion, shall be served by e-mail, facsimile, or overnight courier to (i) all parties that executed confidentiality agreements in connection with the possible purchase of any of Assets; (ii) counsel to the Committee; (iii) counsel to the DIP Agent; (iv) counsel to the Prepetition Agent; (v) counsel to the Prepetition Mezzanine Lenders counsel for the Senior Lender; (vi)  the Office of the United States Trustee for the District of Delaware; (vii) all entities known by the Debtors to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in the Debtors' cases as of the date hereof; and (viii) all parties (and their counsel, if known) which hold liens on or security interests in any of the Assets.

44.    In order to ensure broad dissemination of notice of the sale, the Sale Hearing, and the Bidding Procedures, the Debtors propose that they serve, by a date to be determined by the Court, by first class U.S. mail:

(1)    A conformed copy of the Procedures Order upon (i) all parties that executed confidentiality agreements in connection with the possible purchase of any of Assets; (ii) counsel to the Committee; (iii) counsel to the DIP Agent; (iv) counsel to the Prepetition Agent; (v) counsel to the Prepetition Mezzanine Lenders counsel for the Senior Lender; (vi)  the Office of the United States Trustee for the District of Delaware; (vii) all entities known by the Debtors to have filed a notice of appearance or a request for receipt of chapter 11 notices and pleadings filed in the Debtors' cases as of the date hereof; (viii) all federal, state

-23-

and local regulatory and taxing authorities and recording offices which have a known interest in the relief requested in this Motion; and (ix) all parties (and their counsel, if known) which hold liens on or security interests in any of the Assets; and

(2)     copies of the "Notice of Sale of Substantially All of Debtors' Assets," substantially in the form of that which is annexed to the Procedures Order as <u>Exhibit 3</u> thereof (the "<u>Sale Notice</u>"), upon all creditors and equity security holders identified in the list of creditors and equity security holders and upon all current and former employees employed by the Debtors since 2007 and upon all parties having filed a proof of claim or interest in the Debtors' cases (other than those parties which received notice under subparagraph (1) above).

45.     Additionally, the Debtors will publish a notice substantially in the form of the Sale Notice in the *Wall Street Journal* promptly after entry of the Procedures Order.

46. Under all of the relevant facts and circumstances herein and the nature of the relief requested herein, the Debtors respectfully submit that the foregoing notice should be deemed adequate and sufficient notice of the sale, the Sale Hearing, the Bidding Procedures, and the Motion.

47.     No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Debtors request that the Court enter: (A) a Bidding Procedures Order, substantially in the form attached hereto as Exhibit C, (1) approving bidding procedures; (2) scheduling an auction; (3) approving the granting of an expense reimbursement fee as bid protection to a stalking horse bidder; and (4) scheduling a sale hearing; and (B) a Sale Order in a form to be filed as a supplemental Exhibit D to this Motion, (1) approving the Debtors' proposed sale of substantially all of their assets; (2) approving the Debtors' assumption and assignment of executory contracts and unexpired leases as provided in any Successful Bid(s) approved by the Court; and (3) granting the Debtors such other relief as the Court may deem just and proper.

Dated: January 9, 2009

**PEPPER HAMILTON LLP**

/s/ Leigh-Anne M. Raport
David M. Fournier (DE No. 2812)
Leigh-Anne M. Raport (DE No. 5055)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile: 302.421.8390
fournied@pepperlaw.com
raportl@pepperlaw.com

- and-

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
100 Renaissance Center, Suite 3600
Detroit, MI 48243-1157
Telephone: 313.259.7110
Facsimile: 313.259.7926
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

*Counsel for the Debtors*