**THIS DISCLOSURE STATEMENT IS SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PPI HOLDINGS, INC., et al.,[1] | ) Case No. 08-13289 (KG) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Voting Deadline: _____, 2011 at 4:00 p.m. EST** |
| | ) **Objection Deadline: _____, 2011 at 4:00 p.m. EST** |
| | ) **Confirmation Hearing: _____, 2011 at _:___ _.m. EST** |

**FIRST AMENDED DISCLOSURE STATEMENT REGARDING JOINT CHAPTER 11 PLAN OF LIQUIDATION BY THE DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED AS OF SEPTEMBER 10, 2010**

Dated:  June 17, 2011

| | |
|---|---|
| PEPPER HAMILTON LLP<br>David M. Fournier, Esq.<br>John H. Schanne, II, Esq.<br>Hercules Plaza, Suite 5100<br>1313 N. Market Street, P.O. Box 1709<br>Wilmington, DE 19899<br><br>- and -<br><br>PEPPER HAMILTON LLP<br>Robert S. Hertzberg, Esq.<br>100 Renaissance Center<br>Suite 3600<br>Detroit, MI 48243<br><br>*Counsel to Debtors and Debtors-in-Possession* | STEVENS & LEE, P.C.<br>Joseph H. Huston, Jr., Esq.<br>Maria Aprile Sawczuk, Esq.<br>1105 N. Market Street, 7th Floor<br>Wilmington, DE 19801<br><br>*Counsel to Official Committee of Unsecured Creditors* |

---

[1]  The Debtors in these proceedings are:  PPI Holdings, Inc.; International Fineblanking Corporation; PPI Sub 1, Inc. (f/k/a MPI International Holdings, Inc.); PPI Sub 1A, Inc. (f/k/a MPI International, Inc.); Michigan Fineblanking, Inc.; PPI Sub-Holdings, Inc.; Precision Parts International Services Corp.; PPI Sub 2, Inc. (f/k/a Skill Tool & Die Holdings Corp.); and PPI Sub 2A, Inc. (f/k/a Skill Tool & Die Corp.).

# TABLE OF CONTENTS

I.     INTRODUCTION. .................................................................................................................1

II.    A BRIEF OVERVIEW OF CHAPTER 11. ......................................................................2

III.   VOTING AND CONFIRMATION OF THE PLAN. .........................................................4

     A.     Voting and Ballots ...................................................................................................4

     B.     Confirmation Hearing ..............................................................................................5

IV.   RECOMMENDATION. .....................................................................................................6

V.    IMPORTANT CONSIDERATIONS AND RISK FACTORS. ..........................................6

     A.     Read this Disclosure Statement and the Plan Carefully ..........................................6

     B.     The Debtors Have No Duty to Update .....................................................................7

     C.     No Representations Outside the Disclosure Statement are Authorized .....................7

     D.     All Information was Provided by the Debtors, and was Relied Upon by Professionals .........................7

     E.     Projections and Other Forward Looking Statements are Not Assured, and Actual Results May Vary 7

     F.     This Disclosure Statement was Not Approved by the Securities and Exchange Commission .............8

     G.     No Legal or Tax Advice is Provided to You by this Disclosure Statement ................8

     H.     No Admissions Made ...............................................................................................8

     I.      No Waiver of Right to Object or Right to Recover Transfers and Estate Assets .......8

     J.     Certain Risk Factors ................................................................................................9

     K.     Bankruptcy Law Risks and Considerations ..............................................................9

         1.     *Confirmation of the Plan is Not Assured* ...................................................9

         2.     *The Effective Date Might Be Delayed or Never Occur* ..............................9

         3.     *Projections* ...............................................................................................9

         4.     *Tax Considerations* ...................................................................................10

VI.   HISTORICAL INFORMATION. ....................................................................................10

     A.     Situational Overview. ..............................................................................................10

     B.     Overview of the Debtors' Business Operations. .......................................................10

         1.     *Debtors' History and Corporate Structure* ...............................................10

         2.     *Sub 1A* ......................................................................................................11

         3.     *Sub 2A* ......................................................................................................11

         4.     *The Debtors' Holding Companies* ............................................................12

     C.     The Debtors' Products .............................................................................................12

     D.     Summary of Prepetition Indebtedness .....................................................................12

         1.     *The Senior Credit Agreement* ...................................................................12

         2.     *The Subordinated Notes* ...........................................................................13

         3.     *The Sub 2A Industrial Development Revenue Bonds* ................................14

     E.     Events Leading to Chapter 11. .................................................................................14

VII.   THE CHAPTER 11 CASES. ............................................................................................16

     A.     Commencement of the Cases ...................................................................................16

     B.     The Debtors' Professionals .......................................................................................16

     C.     The Creditors' Committee ........................................................................................17

     D.     Claims Administration .............................................................................................17

         1.     *Filing of Schedules and Statements of Financial Affairs* ..........................17

         2.     *Bar Date for 503(b)(9) Claims* ................................................................17

         3.     *Bar Date for Prepetition Claims.* ..............................................................17

     E.     Causes of Action Arising Under Chapter 5 of the Bankruptcy Code ........................18

     F.     Other Causes of Action of the Debtors ....................................................................18

     G.     Leases and Executory Contracts ..............................................................................18

     H.     Sale of Substantially All of the Debtors' Assets .......................................................19

     I.      The Lender Settlement Agreement ...........................................................................19

     J.     Disposition of Other Assets .....................................................................................20

VIII.   SUMMARY OF THE PLAN. ..........................................................................................20

     A.     General ....................................................................................................................20

     B.     Plan Overview .........................................................................................................20

     C.     Treatment of Claims and Interests ...........................................................................21

  D.  **Anticipated Distributions**................................................................................................24
  E.  **Treatment of Executory Contracts and Unexpired Leases**................................................25
  F.  **Means for Implementing the Plan**................................................................................25
    1. *Substantive Consolidation* ................................................................................25
    2. *Formation of Liquidating Trust* ........................................................................25
    3. *Conveyance of Liquidating Trust Assets* ..........................................................25
    4. *The Liquidating Trustee*....................................................................................26
  G.  **Effect of Confirmation and Injunction**........................................................................27
    1. ***Injunction.*** ..........................................................................................................27
    2. ***Injunction Against Interference With Plan.***......................................................28
    3. ***Term of Injunctions.*** ..........................................................................................28
    4. ***Exculpation.*** ......................................................................................................28
    5. *Binding Effect of Plan.*........................................................................................29
    6. *Retention of Causes of Action/Reservation of Rights.* ......................................29
  H.  **Post-Confirmation Jurisdiction of the Bankruptcy Court**..............................................29
IX.  **CONFIRMATION OF THE PLAN.**..............................................................................30
  A.  **Introduction** ..................................................................................................................30
  B.  **Conditions to Confirmation and Effective Date** ..........................................................30
  C.  **Voting Procedures and Standards** ..............................................................................30
  D.  **Acceptance** ..................................................................................................................31
  E.  **Confirmation and Consummation** ..............................................................................32
    1. *Best Interests of Holders of Claims and Interests*..............................................33
    2. *Financial Feasibility* ..........................................................................................34
    3. *Acceptance by Impaired Classes* ......................................................................34
    4. *Cramdown* ..........................................................................................................34
    5. *Classification of Claims and Interests* ..............................................................36
X.  **CERTAIN RISK FACTORS TO BE CONSIDERED.**..................................................36
  A.  **Risk That Distributions Will Be Less Than Estimated by the Debtors** ........................36
  B.  **Litigation Risks**............................................................................................................37
  C.  **Bankruptcy Risks** ........................................................................................................37
    1. *Objection to Classifications*..............................................................................37
    2. *Risk of Non-Confirmation of the Plan* ..............................................................37
XI.  **STATEMENT CONCERNING INCOME TAX CONSEQUENCES.**................................37
XII.  **ALTERNATIVES TO LIQUIDATING PLAN.**..............................................................39
XIII.  **CONCLUSION.**............................................................................................................40

# I.      INTRODUCTION.

On December 12, 2008 (the "<u>Petition Date</u>"), PPI Holdings, Inc., International Fineblanking Corporation, MPI International Holdings, Inc. (now known as PPI Sub 1, Inc.), MPI International, Inc. (now known as PPI Sub 1A, Inc.) ("<u>Sub 1A</u>"), Michigan Fineblanking, Inc., PPI Sub-Holdings, Inc., Precision Parts International Services Corp., Skill Tool & Die Holding Corp. (now known as PPI Sub 2, Inc.), and Skill Tool & Die Corp. (now known as PPI Sub 2A, Inc.) ("<u>Sub 2A</u>" and, collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.* as amended, the "<u>Bankruptcy Code</u>").  The Debtors continue to manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On December 23, 2008, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "<u>Creditors' Committee</u>").  No trustee or examiner has been appointed in these Chapter 11 Cases.

The Debtors and the Creditors Committee have filed the Joint Plan of Liquidation by the Debtors and the Official Committee of Unsecured Creditors Dated as of September 10, 2010 (the "<u>Plan</u>").  The Plan provides for the transfer of the Assets and Liabilities of the Debtors to the Liquidating Trust which will be administered by the Liquidating Trustee.  The Liquidating Trustee will liquidate the Debtors' Assets, evaluate, pursue, or settle potential Causes of Action, as appropriate, review the universe of Claims in these Chapter 11 Cases, fix or have determined by the Court the allowed amount of those Claims, and distribute the proceeds from the Assets to the Creditors.  Reference is made in the Plan to this disclosure statement (the "<u>Disclosure Statement</u>") for a discussion of the Debtors' history, business, capital structure, historical financial information, and for a summary and analysis of the Plan.

All Creditors entitled to vote on the Plan should review this Disclosure Statement before voting to accept or reject the Plan.  Documents referenced in the Plan or the Disclosure Statement are also available for review upon request.

This Disclosure Statement is provided pursuant to section 1125 of the Bankruptcy Code to all known Creditors of the Debtors.  The purpose of this Disclosure Statement is to provide sufficient information to enable Creditors who are entitled to vote to on the Plan make an informed decision about whether to vote to accept the Plan.  This Disclosure Statement describes, among other things:

- how to vote on the Plan;

- the former business of the Debtors and the reasons for commencing these Chapter 11 Cases;

- significant events that have occurred in these Chapter 11 Cases;

- the Plan, how distributions under the Plan will be made and the manner in which Disputed Claims will be resolved;

- the procedure and requirements for confirming the Plan; and

- certain federal tax considerations.

Most words or phrases used in this Disclosure Statement shall have their usual and customary meaning. Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. A copy of the Plan is attached hereto as **Exhibit A**.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ BOTH THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.

## II.    A BRIEF OVERVIEW OF CHAPTER 11.

Chapter 11 is the principal reorganization chapter under the Bankruptcy Code. Pursuant to chapter 11, a debtor is authorized to reorganize its financial affairs for its own benefit and that of its creditors. Unless otherwise ordered by the court, the Bankruptcy Code allows a debtor to remain in operation and to work out its financial difficulties. In a chapter 11 case, the debtor continues to manage its affairs as a debtor-in-possession and as a fiduciary to the creditors of the estate. In these Chapter 11 Cases, the Debtors have pursued the liquidation or abandonment, as appropriate, of their Assets in their capacity as debtors-in-possession for the purpose of winding up their affairs.

The commencement of a chapter 11 case creates an estate comprised of all of the legal and equitable interests that the debtor has in property as of the date the bankruptcy petition is filed. The filing of a petition also triggers the "automatic stay" provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides for a stay or an injunction against any attempt to collect a prepetition debt, claim or obligation from the debtor, or to otherwise interfere with its property or financial affairs. Unless the court orders otherwise, the automatic stay remains in full force and effect until a chapter 11 plan is confirmed.

The Bankruptcy Code authorizes the creation of an official creditor committee to protect the interests of creditors. The fees and expenses of counsel and other professionals employed by such official committee are generally borne by the debtor's estate. In these Chapter 11 Cases, the Creditors' Committee was formed to represent the collective interests of unsecured Creditors.

A chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization or liquidation. A chapter 11 plan may either be consensual or non-consensual, and may provide, among other things, for the treatment of the claims of creditors and interests of equity holders. The plan confirmation process, and the conditions for confirming either a consensual or non-consensual plan are more fully described below.

The formulation of a plan is the primary purpose in each chapter 11 case. The plan is the vehicle for setting forth the means by which the debtor will satisfy parties who hold claims against or equity interests in the debtor. Although it is sometimes referred to as a plan of reorganization, a plan may also provide for the orderly liquidation of a debtor's assets. The Plan here is a liquidating chapter 11 plan.

#11822429 v9

After a plan is filed, the holders of claims or interests in a debtor whose claims or interests are proposed to be impaired (*i.e.*, adversely changed from the perspective of the holder) are permitted to vote to accept or reject the plan. Section 1125 of the Bankruptcy Code requires that prior to soliciting acceptances of the proposed plan, the debtor must prepare a disclosure statement which contains adequate information about the debtor, its assets and liabilities, and the plan, to enable a hypothetical, reasonable investor to make an informed judgment about the proposed plan. The Debtors submit that this Disclosure Statement satisfies the requirements of section 1125 of the Bankruptcy Code.

Chapter 11 does not require that each holder of a claim against the debtor vote in favor of the proposed chapter 11 plan in order for the court to confirm the plan. The Bankruptcy Code defines acceptance of the plan by holders of a class of claims against the debtor as acceptance by at least two-thirds in dollar amount and more than one-half of the number of the holders of allowed claims in that class that actually vote. Holders of Claims in these Chapter 11 Cases who fail to vote will <u>not</u> have their Claims counted in determining the outcome of the vote.

Classes of claims that are not "impaired" under a plan are presumed to have accepted the plan and, therefore, are not entitled to vote. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims of that class are modified. Acceptances of the Plan in these Chapter 11 Cases are being solicited only from Holders of Claims in Impaired Classes that are not otherwise deemed to have rejected the Plan.

Even if all of the classes of claims accept a plan, the court may determine that the plan should not be confirmed if the plan does not meet the requirements of section 1129 of the Bankruptcy Code. This section requires, among other provisions, that a plan be in the "best interests" of creditors and "feasible" in order that it may be confirmed. The "best interests" test generally requires that the value of the consideration to be distributed to the holders of claims under a plan may not be less than what they would receive if the assets of the debtor were to be liquidated under a hypothetical liquidation pursuant to chapter 7 of the Bankruptcy Code (in which the debtor's estate is liquidated by a trustee under the statutory scheme set forth in chapter 7, not by a debtor-in-possession or a trustee under a plan). The court must also find that there is a reasonable probability that the debtor will be able to perform the obligations set forth in the plan, and that the debtor will be able to continue operations after confirmation without the need for further financial reorganization in order to fulfill the "feasibility" requirement under section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies both of these requirements, as more fully discussed below.

Even though a creditor may choose not to vote or may choose to vote against a plan, the creditor will be bound by the terms and treatment set forth in the plan, if such plan is accepted by the required majorities in each class of claims entitled to vote on the Plan, or is otherwise confirmed by the court.

The proponent of a plan may seek confirmation of the plan under the so-called "cramdown" provisions of the Bankruptcy Code, in the event the requisite approval of impaired classes is not obtained. Pursuant to section 1129(b) of the Bankruptcy Code, a proponent may "cramdown" a plan against a non-accepting class of claims or equity interests, if the plan complies with all of the requirements of section 1129(a) (except section 1129(a)(8), which

#11822429 v9

requires acceptance by all impaired classes), and the proponent establishes, among other things, that the plan is accepted by at least one impaired class of creditors, that the plan is fair and equitable, and that the plan does not unfairly discriminate. In these Chapter 11 Cases, the Debtors intend to request that the Court confirm the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, in view of the fact that certain classes are considered rejecting ones for Plan voting purposes.

## III. VOTING AND CONFIRMATION OF THE PLAN.

### A. <u>Voting and Ballots</u>

If one or more of your Claims is in a Class entitled to vote on the Plan, the Voting Agent (defined below) has enclosed one or more Ballots with return envelopes (WITHOUT POSTAGE ATTACHED) for voting to accept or reject the Plan. The Creditors' Committee supports the Plan as proposed. The Debtors and the Creditors' Committee (the "<u>Proponents</u>") urge you to <u>accept</u> the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) (WITH POSTAGE AFFIXED BY YOU), to the Voting Agent identified immediately below (the "<u>Voting Agent</u>"):

> IF BY REGULAR MAIL, HAND DELIVERY OR
> OVERNIGHT COURIER:
>
> PPI Holdings Ballot Processing
> c/o Kurtzman Carson Consultants, LLC
> 2335 Alaska Ave.
> El Segundo, CA 90245

Every Ballot must be sent so that it is <u>RECEIVED BY THE VOTING AGENT WITH AN ORIGINAL SIGNATURE</u> (NOT A PHOTOCOPIED OR FACSIMILE SIGNATURE) NO LATER THAN 4:00 P.M., PREVAILING PACIFIC TIME, ON _____, 2011 (the "<u>Voting Deadline</u>").

Detailed voting instructions are printed on and/or accompany each Ballot. Ballots must be received by the Voting Agent on or before the Voting Deadline, and any Ballot received after the Voting Deadline shall <u>not</u> be counted. Any unsigned Ballot or any Ballot that has no original signature, including any Ballot received by facsimile or other electronic means, or a Ballot with only a photocopy of a signature shall <u>not</u> be counted. Any Ballot that is not clearly marked as voting for or against the Plan, or marked as both voting for and against the Plan, shall <u>not</u> be counted. Any Ballot that is properly completed and timely received shall <u>not</u> be counted if such Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant voting Class as of _____ (the "<u>Voting Record Date</u>"). Each Holder of a Claim that is voting more than one Claim in a voting Class must vote all of its Claims within a particular voting Class either to accept or to reject the Plan, and may <u>not</u> split its vote in the same voting Class, and thus, a Ballot (or Ballots in the same voting Class) that partially rejects and partially accepts the Plan will <u>not</u> be counted. Whenever a Holder of a Claim in a voting Class casts more than one Ballot voting the same Claim prior to

the Voting Deadline, the last Ballot physically <u>received</u> by the Voting Agent prior to the Voting Deadline (or the first mail collection on the Voting Deadline, as the case may be) shall be deemed to reflect the voter's intent, and thus shall supersede and replace any prior cast Ballot(s), and any prior cast Ballot(s) shall <u>not</u> be counted.

On June __, 2011, the Debtors filed their Amended Motion for Order (A) Approving Disclosure Statement; (B) Fixing Voting Record Date; (C) Approving Solicitation And Voting Procedures With Respect To Joint Chapter 11 Plan of Liquidation By the Debtors and the Official Committee of Unsecured Creditors Dated as of September 10, 2010; (D) Approving Form Of Solicitation Package And Notices; And (E) Scheduling Certain Dates In Connection Therewith (the "<u>Disclosure Statement Motion</u>").  The Disclosure Statement Motion will seek the entry of an order (the "<u>Disclosure Statement Order</u>") which establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the applicable standards for tabulating Ballots; (c) the deadline for filing objections to confirmation of the Plan; and (d) the date and time of the Confirmation Hearing (also set forth below).

## B. <u>Confirmation Hearing</u>

The Bankruptcy Court will hold the Confirmation Hearing commencing at _____ (Eastern Time), on _____ at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 2, Wilmington, Delaware 19801, before the Honorable Kevin Gross, United States Bankruptcy Judge.  The Confirmation Hearing may be adjourned from time to time without further notice.  At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite vote has been obtained for each Class entitled to vote under the Plan, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be in writing and filed with the Bankruptcy Court and served in a manner so as to be <u>received</u> on or before _____, 2011 at 4:00 p.m. Eastern Time by:

#11822429 v9

Counsel for the Debtors:

David M. Fournier (DE No. 2812)          Robert S. Hertzberg, Esq.
John H. Schanne, II (DE No. 5260)        PEPPER HAMILTON LLP
PEPPER HAMILTON LLP                      100 Renaissance Center
Hercules Plaza, Suite 5100               Suite 3600
1313 Market Street                       Detroit, MI 48243
P.O. Box 1709                            Telephone:  313.259.7110
Wilmington, DE 19899-1709                Facsimile:  313.259.7926
Telephone:  302.777.6500
Facsimile:  302.421.8390


Counsel for the Creditors' Committee:

Joseph H. Huston, Jr.
Maria Aprile Sawczuk
STEVENS & LEE, P.C.
1105 N. Market Street
Seventh Floor
Wilmington, DE 19801
Telephone:  302.654.5180
Facsimile:  610.988.0838

## IV.    RECOMMENDATION.

The Proponents strongly recommend that you <u>vote</u> <u>in</u> <u>favor</u> of the Plan.  Your vote on the Plan is important.  Non-acceptance of the Plan may result in protracted delays, a chapter 7 liquidation, or confirmation of an alternative chapter 11 plan.  These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. The Proponents believe that unsecured creditors will receive a greater distribution under the Plan than they would in a chapter 7 liquidation, as more fully discussed below.

## V.    IMPORTANT CONSIDERATIONS AND RISK FACTORS.

### A.    <u>Read this Disclosure Statement and the Plan Carefully</u>

ALL CREDITORS ARE URGED TO CAREFULLY READ THIS DISCLOSURE STATEMENT, WITH ALL ATTACHMENTS AND ENCLOSURES IN THEIR ENTIRETY, IN ORDER TO FORMULATE AN INFORMED OPINION AS TO THE MANNER IN WHICH THE PLAN AFFECTS THEIR CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, AND TO DETERMINE WHETHER TO VOTE TO ACCEPT THE PLAN.

YOU SHOULD ALSO READ THE PLAN CAREFULLY AND IN ITS ENTIRETY.  THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF THE PLAN FOR YOUR CONVENIENCE, BUT IN THE EVENT OF ANY INCONSISTENCY, THE TERMS OF THE PLAN ITSELF SUPERSEDE AND CONTROL.

## B. The Debtors Have No Duty to Update

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS, AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT AFTER THAT DATE DOES NOT IMPLY THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THAT DATE. THE DEBTORS HAVE NO DUTY TO UPDATE THIS DISCLOSURE STATEMENT.

## C. No Representations Outside the Disclosure Statement are Authorized

NO REPRESENTATIONS CONCERNING OR RELATED TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN, ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY UPON ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE, OR REJECTION, OF THE PLAN THAT IS OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT IN ARRIVING AT YOUR DECISION.

## D. All Information was Provided by the Debtors, and was Relied Upon by Professionals

ALL COUNSEL AND OTHER PROFESSIONALS FOR THE DEBTORS HAVE RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH COUNSEL FOR THE DEBTORS HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT VERIFIED INDEPENDENTLY THE INFORMATION CONTAINED HEREIN.

## E. Projections and Other Forward Looking Statements are Not Assured, and Actual Results May Vary

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS, BY NATURE, FORWARD LOOKING, AND CONTAINS ESTIMATES AND ASSUMPTIONS WHICH MAY ULTIMATELY PROVE TO BE INCORRECT, AND CONTAINS PROJECTIONS WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THERE ARE UNCERTAINTIES ASSOCIATED WITH ANY PROJECTIONS AND ESTIMATES, AND ALL SUCH PROJECTIONS AND ESTIMATES SHOULD NOT BE CONSIDERED ASSURANCES OR GUARANTEES OF THE AMOUNT OF FUNDS THAT MIGHT BECOME AVAILABLE FOR DISTRIBUTION, OR THE AMOUNT OF CLAIMS OR INTERESTS IN THE VARIOUS CLASSES THAT MIGHT BE ALLOWED.

SPECIFICALLY, THE ALLOWED AMOUNT OF CLAIMS IN EACH CLASS COULD BE SIGNIFICANTLY MORE THAN PROJECTED, WHICH, IN TURN, COULD CAUSE DISTRIBUTIONS TO BE REDUCED SUBSTANTIALLY. IF NON-PROFESSIONAL FEE ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS,

#11822429 v9

503(B)(9) CLAIMS, PRIORITY TAX CLAIMS, PRIORITY UNSECURED CLAIMS, OTHER SECURED CLAIMS OR CONVENIENCE CLAIMS EXCEED PROJECTIONS, FEWER ESTATE ASSETS OR NONE AT ALL MAY BE AVAILABLE FOR DISTRIBUTION TO THE HOLDERS OF GENERAL UNSECURED CLAIMS.

F. **This Disclosure Statement was Not Approved by the Securities and Exchange Commission**

ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN SERVED ON THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("SEC"), THIS DISCLOSURE STATEMENT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. NEITHER THE SEC, NOR ANY STATE REGULATORY AUTHORITY, HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS HERETO, OR THE STATEMENTS CONTAINED HEREIN, AND ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

G. **No Legal or Tax Advice is Provided to You by this Disclosure Statement**

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT HIS, HER, OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS, HER, OR ITS CLAIM OR INTEREST.

THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OR OBJECT TO CONFIRMATION OF SUCH PLAN.

H. **No Admissions Made**

NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY (INCLUDING, WITHOUT LIMITATION, THE DEBTORS), OR BE ADMISSIBLE (UNDER FEDERAL RULE OF EVIDENCE 408 AND SIMILAR STATE RULES) IN ANY OTHER PROCEEDING OR MATTER INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR ON HOLDERS OF CLAIMS OR INTERESTS.

I. **No Waiver of Right to Object or Right to Recover Transfers and Estate Assets**

ANY VOTE FOR OR AGAINST THE PLAN SHALL NOT CONSTITUTE A WAIVER OR RELEASE OF ANY CLAIMS OR RIGHTS OF THE DEBTORS (OR ANY PARTY IN INTEREST, AS THE CASE MAY BE) TO OBJECT TO THAT CREDITOR'S CLAIM, OR RECOVER ANY PREFERENTIAL, FRAUDULENT, OR OTHER VOIDABLE TRANSFER OR ESTATE ASSETS FROM SUCH CREDITOR, REGARDLESS OF

WHETHER ANY CLAIMS OF THE DEBTORS OR THEIR RESPECTIVE ESTATES ARE SPECIFICALLY OR GENERALLY IDENTIFIED HEREIN.

### J.    Certain Risk Factors

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS DISCUSSED BELOW PRIOR TO VOTING ON THE PLAN.  THESE RISK FACTORS, HOWEVER, SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN OR ITS IMPLEMENTATION.

### K.    Bankruptcy Law Risks and Considerations

#### 1.    *Confirmation of the Plan is Not Assured*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate a resolicitation of votes.  Additionally, if the conditions to confirmation set forth in the Plan are not satisfied or waived, the Plan shall not, by its own terms, be confirmed by the Bankruptcy Court.

#### 2.    *The Effective Date Might Be Delayed or Never Occur*

There can be no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived by the Debtors in accordance with the Plan, the Plan may not become effective and the Confirmation Order would be vacated.  In that event, no distributions would be made and the Holders of Claims and Interests would be restored to the status quo ante as of the moment before confirmation, and the Debtors' obligations for Claims and Interests would remain unchanged.

#### 3.    *Projections*

This Disclosure Statement contains the Debtors' projections of Allowed Claims against the Estates.  While the Debtors believe that their projections of Allowed Claims are reasonable, there can be no assurance that such projections will be realized, and the amount of Allowed Claims could be significantly more than projected and the amount of distributable Assets could be less than projected, resulting in a substantial reduction in the recoveries to Creditors projected herein.  These projections are preliminary and subject to change.  The claims administration and objection process may result in substantially different figures, which could have a material effect on distributions under the Plan.

#11822429 v9

The tax consequences of the Plan will vary based on the individual circumstances of each Holder of a Claim or Interest.  Accordingly, each Holder of a Claim or Interest is strongly urged to consult with his, her, or its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

# VI.     HISTORICAL INFORMATION.

## A.     Situational Overview.

The Debtors were leading designers and manufacturers in the area of fineblanking, a high-precision manufacturing process that combines principles of metal stamping and cold-forming, as well as in the area of traditional, high-precision metal stamping for a diverse customer base in a variety of end markets, including automotive (on a Tier 1, Tier 2 and Tier 3 basis), construction, agricultural, and lawn and garden.  The Debtors sold products to major North American automotive and non-automotive original equipment manufacturers (the "OEMs") and Tier 1 and Tier 2 suppliers.  The Debtors operated 6 manufacturing facilities throughout North America, including a facility in Mexico operated on the Debtors' behalf by Intermex Manufactura de Chihuahua ("Intermex") under a shelter and logistics agreement.  The Debtors also operated a sales office and corporate headquarters in Rochester Hills, Michigan.  Each manufacturing facility was strategically located near key customer facilities, enabling the Debtors to provide their products on a just-in-time basis.

The Debtors' operations consisted of two distinct lines of business:  Sub 1A performed fineblanking work and conventional metal stamping, as well as a range of value-added finishing operations, and Sub 2A performed conventional metal stamping, as well as a range of assembly and value-added finishing operations.

Various factors combined to cause the Debtors to seek relief under chapter 11 of the Bankruptcy Code to preserve the value of the Estates' assets.  Among other things, recent industry-wide changes in the automotive sector in which the Debtors competed, primarily in the form of lower volumes from domestic OEMs and increased competition as well as increasing raw material prices (particularly steel), combined to reduce the Debtors' revenues and cash flow from operations and impair their ability to service their debt.  These pressures were exacerbated by the worldwide financial and economic crisis.  The Debtors concluded, therefore, that chapter 11 offered the best opportunity to preserve value for all constituencies.

## B.     Overview of the Debtors' Business Operations.

### 1.     *Debtors' History and Corporate Structure*

In September 2005, First Atlantic Capital, Ltd. ("First Atlantic"), through its investment fund Atlantic Equity Partners III, LP ("AEP"), acquired the Debtors from Morgenthaler Partners in a sponsor-to-sponsor stock transaction.  The Debtors are organized as follows:  PPI Holdings, Inc., a Delaware corporation, is wholly owned by First Atlantic and certain other stockholders, none of which is a debtor in these Chapter 11 Cases.  PPI Sub-Holdings, Inc., a Delaware corporation, is a wholly owned subsidiary of PPI Holdings, Inc.  PPI

Sub 1, Inc. (f/k/a MPI International Holdings, Inc.), Precision Parts International Services Corp. and PPI Sub 2, Inc. (f/k/a Skill Tool & Die Holdings Corp.) are Delaware corporations and are directly and wholly owned by PPI Sub-Holdings, Inc.  Sub 1A (f/k/a MPI International, Inc.) is a Michigan corporation and is directly and wholly owned by PPI Sub 1.  Sub 2A (f/k/a Skill Tool & Die Corp.) is a Michigan corporation and is directly and wholly owned by PPI Sub 2, Inc.  Michigan Fineblanking Inc., a Michigan corporation, and International Fineblanking Corp., an Ohio corporation, are both defunct entities and are directly and wholly owned by PPI Sub 1, Inc.  Sub 1A and Sub 2A were the primary operating entities; Precision Parts International Services Corp. employed the corporate senior management.  Sub 1A and Sub 2A are described in greater detail below.

2.   *Sub 1A*

Sub 1A was a leading full-service designer and manufacturer of complex, high-precision metal components integral to engine, transmission, brake, safety and seating systems.  Products manufactured by Sub 1A began with the fineblanking process.  Fineblanking is a specialized process that combines the principles of metal stamping and cold-forming and was developed to overcome the limitations of conventional stamping.  The process is most suitable for smaller, intricate parts such as components for automobile transmissions, brakes and engines.  Fineblanking fills a niche for the manufacture of parts that, due to their complexity, would otherwise require multiple machining processes or could not be manufactured at competitive costs.  Sub 1A also offered complete tool-build services, as well as full-service finishing and assembly capabilities.

Founded in 1969, Sub 1A operated facilities in Indiana, Wisconsin, and Tennessee, and on the Petition Date employed approximately 98 salaried and 655 hourly employees.

The Debtors' operations under Sub 1A also included Sub 1A's contractual arrangement with Intermex (the "Mexican Facility") for the production of parts for certain of Sub 1A's customers using conventional metal stamping processes.  The Mexican Facility used tooling and equipment owned by Sub 1A; however, most other aspects of the operation, including employees, building lease, and nearly all third party contracts, were contracted through Intermex on a "cost plus" basis.  The Debtors had no ownership interest in Intermex.

3.   *Sub 2A*

Formed in 1966, Sub 2A operated a facility in Ohio and on the Petition Date employed approximately 14 salaried and 56 hourly employees.

Sub 2A produced parts with conventional stamping and assembly processes.  Sub 2A specialized in large high precision stampings of up to 50" width.  Sub 2A's capabilities included in-die extrusion and tapping, stampings requiring a class A surface and deep-draw stampings.  Sub 2A also produced miscellaneous interior, non-class A stampings for its customers.  Sub 2A offered its customers services in engineering, in-house tooling development, and manufacturing technology.

#11822429 v9

4. *The Debtors' Holding Companies*

Four of the Debtors are holding companies that have no employees and were not involved in the Debtors' day-to-day operations: PPI Holdings, Inc., PPI Sub-Holdings, Inc., PPI Sub 1, Inc. and PPI Sub 2, Inc.

## C. **The Debtors' Products**

The Debtors sold a portion of their products directly to OEMs as finished components; however, most of the Debtors' products were used to produce "systems" or "subsystems," i.e., groups of component parts located in the vehicle operating together to fulfill a specific vehicle function. Generally, Sub 1A's highest-selling products could be classified into the following categories: (a) transmission components, including clutch subassemblies, shift detent assemblies, and cam actuators; (b) engine components, including engine manifolds, engine safety release flanges, and fuel system components; and (c) climate control, including hydraulic pump components and air conditioner compressor valve plates. Sub 2A's highest-selling products could be broadly classified into the following categories: (a) automotive structural components, including tire brackets, body-under-frame components and side-impact beams; (b) other automotive components, such as backing plates and fasteners; and (c) industrial components, such as faucet throat plates.

## D. **Summary of Prepetition Indebtedness**

As of the Petition Date, the Debtors' total secured and unsecured long-term liabilities were approximately $184.5 million. The Debtors' aggregate trade debt as of the Petition date was approximately $30 million.

The Debtors' prepetition, long-term debt structure was composed of: (a) a secured senior term loan, secured revolver and secured junior term loan issued under a Senior Credit Agreement dated as of September 30, 2005 (as amended from time to time, the "Prepetition Senior Credit Agreement"); and (b) loans issued under a Subordinated Note Purchase Agreement dated as of September 30, 2005 (as amended from time to time, the "Prepetition Mezzanine Agreement"). Additionally, Sub 2A was liable on industrial development revenue bonds issued on August 1, 1999, which were secured by an irrevocable letter of credit issued under the Prepetition Senior Credit Agreement. The remainder of this section summarizes the Debtors' primary long-term debt obligations as of the Petition Date in order of priority:

1. *The Senior Credit Agreement*

On September 30, 2005, PPI Sub-Holdings, Inc., MPI International Holdings, Inc. (k/n/a PPI Sub 1, Inc.) Precision Parts International Services Corp., Precision Gear Holdings, Inc.[2] and Skill Tool & Die Holdings Corp. (k/n/a PPI Sub 2, Inc.) (collectively, the "Prepetition

---

[2] Precision Gear Holdings, Inc. was subsequently sold on June 2, 2008 to OEP Precision Holdings LLC, an entity not affiliated with First Atlantic.

Borrowers") entered into the Prepetition Senior Credit Agreement in connection with the 2005 acquisition of PPI by First Atlantic. The syndicate of institutional lenders under the Prepetition Senior Credit Agreement (the "Prepetition Senior Lenders") was led by General Electric Capital Corporation ("GECC" or the "Prepetition Agent") as administrative agent and collateral agent. Pursuant to the Prepetition Senior Credit Agreement, the Prepetition Senior Lenders agreed to extend revolving and term credit facilities to, and to issue letters of credit for, the Prepetition Borrowers from time to time, including, among other things, (i) revolving loans in an aggregate committed amount of up to $19,701,497.89 (as amended from time to time, the "Prepetition Revolver"); (ii) term loans in an aggregate original principal amount of $115,000,000 (as amended from time to time, the "Prepetition Senior Term Loan"); and junior term loans in an aggregate original principal amount of $14,000,000 (as amended from time to time, the "Prepetition Junior Term Loan"). The Prepetition Borrowers' obligations under Prepetition Senior Credit Agreement are guaranteed by PPI Holdings, Inc. and secured by a first-priority lien against substantially all of the Debtors' assets as outlined in the Prepetition Guaranty and Security Agreement executed as of the same date by each of the Prepetition Borrowers.

The Prepetition Senior Credit Agreement was amended thirteen times. In connection with one of the amendments to the Prepetition Senior Credit Agreement, the Prepetition Borrowers entered into a Junior Term Loan Joinder Agreement dated as of February 22, 2008 with First Atlantic (through its investment fund, AEP) and the Prepetition Mezzanine Lenders (as defined below) (together with First Atlantic, the "Prepetition Junior Lenders"). Under the Junior Term Loan Joinder Agreement, the Prepetition Junior Lenders became parties to the Prepetition Senior Credit Agreement, with a "last-out" share in the Prepetition Senior Lenders' liens, subordinate to the interests of the Prepetition Senior Lenders. The Prepetition Junior Lenders issued the Prepetition Junior Term Loan, which was funded in two $7 million tranches in February and April 2008. Interest under the Prepetition Junior Term Loan is payable in kind ("PIK"), and the total balance owed on the Prepetition Junior Term Loan as of the Petition date was approximately $14.8 million.

As of the Petition Date, the total amount outstanding under the Prepetition Senior Credit Agreement (*excluding* accrued interest, amendment and forbearance fees, costs, expenses and letters of credit) was approximately $89.1 million.

2.    *The Subordinated Notes*

Also on September 30, 2005, PPI Holdings, Inc. and PPI Sub-Holdings, Inc. entered into the Subordinated Note Purchase Agreement (as amended from time to time, the "Prepetition Mezzanine Agreement") with Norwest Mezzanine Partners II, LP, LEG Partners Debenture SBIC, L.P. and Golub Capital CP Funding LLC (collectively, the "Prepetition Mezzanine Lenders"). This transaction was also in connection with the 2005 acquisition of PPI by First Atlantic. The Prepetition Mezzanine Agreement originally provided for aggregate unsecured borrowings of $55 million consisting of a seven year, non-amortizing term loan (as amended from time to time, the "Prepetition Mezzanine Loan"). The Prepetition Mezzanine Agreement was amended five times, as a result of which the principal balance was increased from $55 million to $85.5 million. As of the Petition Date, the total amount outstanding under the Prepetition Mezzanine Agreement (including accrued interest) was approximately $88.5 million.

3. *The Sub 2A Industrial Development Revenue Bonds*

On August 1, 1999, the County of Lorain, Ohio issued $6.5 million in industrial development revenue bonds ("IDRBs") and loaned the proceeds to Sub 2A to assist in the construction of Sub 2A's Avon, Ohio facility and the acquisition and installation of equipment. The IDRBs were secured by an irrevocable letter of credit and mature on August 1, 2014. As of the Petition Date, the total amount outstanding under the IDRBs (including accrued interest) was approximately $2 million.

E. **Events Leading to Chapter 11.**

On the Petition Date, the Debtors' non-automotive markets remained relatively strong, but the North American light vehicle industry was in the midst of a dramatic restructuring, complicated by the global financial and economic crisis. Both domestic OEMs and certain suppliers faced troubling times caused by (a) a steady decline in market share by domestic OEMs, (b) noncompetitive cost structures as a result of inflated union wages and pension and legacy costs, (c) significant increases in raw material prices (*e.g.*, steel and resin), and (d) excess production capacity.

In order to lower costs and improve quality, OEMs were awarding sole-source contracts to full-service suppliers who have the capability and ability to design and manufacture their products. OEMs and suppliers are continually looking for opportunities to source product in developing countries as a means to lower costs and improve margins and profit. To minimize supply chain costs and allow for rapid shifts in manufacturing output (in response to consumer purchasing trends), the automotive supply chain follows the just-in-time model, in which OEMs maintain typically no more than one to three days' inventory of parts and raw materials, and at times for certain parts schedule delivery of components in part number sequence directly to the assembly line. This system requires highly choreographed design, purchasing, shipping, warehousing, and manufacturing operations. Thus, disruption at any level of the production process could have a dramatic ripple effect up and down the automobile supply chain.

In response to these changes, and similar trends in the other markets in which the Debtors competed, the Debtors developed facilities with wider and more efficient product-manufacturing and technical capabilities. The Debtors broadened their geographic coverage and strengthened their ability to design and manufacture products by developing and maintaining state-of-the-art facilities within the United States strategically located in close proximity to their customers as a means to reduce freight and delivery costs and deliver products on a just-in-time basis. In addition, the Debtors sought to reduce material costs by centralizing purchasing and reducing inventories through steel purchase management and elimination of external storage, reduce manufacturing costs through implementation of a "lean" material system and improved productivity, and rationalize operations through elimination of excess capacity.

These efforts continued to be complicated by the nature of the Debtors' production "programs" with Tier 1 and 2 automotive suppliers and OEMs in all lines of their business. The Debtors typically entered into arrangements with customers to supply product for a particular platform with a certain tooled capacity. These arrangements had a duration equal to

the life of the platform, generally three to seven years for automotive vehicles. The terms of these arrangements did not require that customers commit to purchase a minimum quantity.

The Debtors were also required to undergo a rigorous certification process for each part or assembly that would be integrated into the final product. Many of the parts the Debtors produced had a lead time of approximately two years from product development to production due to extensive testing and evaluation. Major new product launches required the Debtors to allocate production space and make upfront investments in new equipment and tooling necessary to design and manufacture the product. These investments were generally funded by cash from operations, incurring additional indebtedness, or issuing additional equity. It often took several years before the Debtors realized any revenues related to investment in new equipment, tooling, and engineering supporting new production.

The Debtors competed for new business at the beginning of the development process for new and successor platforms. If the Debtors failed to obtain new business on new models or to retain or increase business on redesigned existing models, their business and financial results were directly and negatively affected. The relatively long lead times required for the production of many of the Debtors' complex structural components and the lengthy process associated with obtaining awards of new business from Tier 1 and 2 suppliers and OEMs made it difficult for the Debtors to obtain new sales arrangements to replace any unexpected decline in the sale of existing products. Thus, significant volume reductions by OEMs had a negative impact on the Debtors' profitability.

Additionally, the Debtors' liquidity and profitability were highly dependent on the cost of raw materials, particularly steel. Increases in the cost of steel dramatically affected the Debtors' profit margins on all products. When the Debtors were unable to pass increases in raw material costs on to their customers, the Debtors' profit margins were directly and negatively affected.

The Debtors' liquidity and profitability were also affected by the price for steel scrap, or "offal." The nature of the Debtors' fineblanking and precision stamping operations resulted in a high volume of offal. The Debtors resold their offal to certain scrap steel customers, which allowed the Debtors to recoup some of the costs of the raw material. However, when the price of offal dropped, the Debtors' profit margins were directly and negatively affected. Prior to the Petition Date, the price of offal dropped precipitously, from $.40/lb. in July 2008 to $.05/lb. in November 2008. This drop in price had a significant negative impact on the Debtors' financial condition.

Over the last several years prior to the Petition Date, the Debtors focused on reducing costs, maximizing cash return on invested capital, reducing indebtedness and matching capital expenditures with operational cash flow in order to mitigate against expected production slowdowns. Historically, the Debtors were able to generate sufficient cost savings to offset any price concessions made to customers or raw material price increases. Shortly before the Petition Date, however, the Debtors' operational flexibility was severely restricted as a result of sharply declining North American OEM production levels and increased raw material and other costs that the Debtors could not fully pass along to customers, as well as continued price pressure from customers.

The Debtors' revenue through third quarter 2008 declined to $126.2 million from $154.5 million in the same period in 2007. Throughout this period, the Debtors were saddled with over $184 million in secured and unsecured long-term debt. As liquidity pressures increased over the course of 2008, the Debtors were unable to service their debt. Thus, beginning in January 2008, the Debtors entered into a series of forbearance agreements and amendments to the Prepetition Senior Credit Agreement, including waivers of certain covenant and financial defaults (collectively, the "<u>Forbearance Agreements</u>"). The Debtors operated under the Forbearance Agreements from January 2008 until the Petition Date (the "<u>Forbearance Period</u>"). During the Forbearance Period, the Debtors made regular interest and principal payments and, since June 2, 2008, accrued additional unpaid default interest of 2%. These interest payments placed an additional strain on the Debtors' cashflow and contributed to the Debtors' liquidity difficulties.

As a result of the Debtors' extensive leveraging and the necessity of operating under a cash dominion system, the Debtors' entire cashflow from operations went to service debt, with the Debtors' only liquidity being its borrowing availability under the Revolver. With the cumulative adverse effects of the above-mentioned factors and the Debtors' inability to reduce costs or increase prices sufficiently, the Debtors' limited availability under the Revolver left the Debtors unable to meet their financial obligations. Between November 21, 2008, and the Petition Date, with no prospect of third party financing, the Debtors negotiated extensively with their prepetition secured lenders in order to obtain a post-petition financing facility. Those negotiations proved successful, and certain of the Debtors' prepetition lenders agreed to provide post-petition financing to the Debtors.

The Debtors then worked with their principal economic stakeholder constituencies to use the Chapter 11 Cases to preserve the value of the Estates' assets through an orderly going-concern sale.

## VII. THE CHAPTER 11 CASES.

### A. <u>Commencement of the Cases</u>

The Debtors commenced these cases on the Petition Date by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors filed a number of motions seeking entry of so-called "first day" orders intended to facilitate the Debtors' transition into chapter 11 by approving certain regular business conduct for which approval of the Bankruptcy Court is required. The first day hearings were held on December 15, 2008. Also on the Petition Date, or shortly thereafter, the Debtors filed a number of motions seeking entry of so-called "next day" orders that, while critical to the Debtors' business, did not have the same urgency as or required greater notice than the "first day" orders.

### B. <u>The Debtors' Professionals</u>

In connection with the Chapter 11 Cases, the Debtors filed retention applications for certain professionals to represent and assist them in the administration of the Chapter 11 Cases. Specifically, the Debtors sought, and the Court approved, the retention of (i) Pepper Hamilton, LLP as counsel to the Debtors (Docket No. 49), (ii) Alvarez & Marsal North America,

LLC as financial advisors to the Debtors (Docket No. 54) and (iii) Grant Thornton LLP as tax advisors and auditors for the Debtors (Docket No. 558). The Court approved the Debtors' applications to retain Pepper Hamilton, LLP (Docket No. 120), Alvarez & Marsal North America, LLC (Docket No. 121) and Grant Thornton LLP (Docket No. 626).

### C.     The Creditors' Committee

At a formation meeting held on December 23, 2008, the Office of the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. The Creditors' Committee is comprised of: (1) Golub Capital Incorporated, (2) Norwest Mezzanine Partners, LP, (3) Gibraltar Industries, (4) Heidtman Steel and (5) Machine Concepts Inc. The Creditors' Committee sought, and the Court approved, the retention of Stevens & Lee, P.C. (Docket No. 125) as counsel to the Creditors' Committee, Proskauer Rose LLP (Docket No. 174), as special Creditors' Committee counsel, Nachman Hays Browstein, Inc., as financial advisors (Docket No. 232) and ASK Financial LLP, as special counsel to analyze and litigate preference claims (Docket No. 1077). The court approved the Creditors' Committee's applications to retain Stevens & Lee, P.C. (Docket No. 255), Proskauer Rose LLP (Docket No. 344), Nachman Hays Browstein, Inc. (Docket No. 345) and ASK Financial LLP (Docket No. 1097).

### D.     Claims Administration

1.     *Filing of Schedules and Statements of Financial Affairs*

On January 26, 2009, each of the Debtors filed their respective Schedules and Statements of Financial Affairs(Docket Nos. 183-200).

2.     *Bar Date for 503(b)(9) Claims*

On February 18, 2009 the Bankruptcy Court entered an Order Granting Debtors' Motion for the Entry of an Order Establishing and Implementing Exclusive, Global Procedures for the Allowance of Section 503(b)(9) Claims Relating to Goods Received within Twenty Days Prior to the Petition Date (the "503(b)(9) Claims Bar Date Order") (Docket No. 290). The 503(b)(9) Claims Bar Date Order established April 16, 2009 at 4:00 p.m. as the date by which all 503(b)(9) Claims were to be filed with the Bankruptcy Court.

3.     *Bar Date for Prepetition Claims*

On October 7, 2009, the Bankruptcy Court entered an Order Establishing Bar Dates for Filing Proofs of Claim and Requests for Allowance of Administrative Expenses, and Approving Form, Manner and Sufficiency of Notice Thereof (the "Bar Date Order") [Docket No. 739]. The Bar Date Order set a General Bar Date of December 15, 2009 at 4:00 p.m. in these cases for the filing of pre-petition claims and for the filing of requests for allowance of administrative expenses arising on or before August 31, 2009. The Bar Date Order also set a Rejection Damages Bar date as the later of: (a) the General Bar Date, or (b) 30 days after rejection of the executory contract or unexpired lease and a Schedule Bar Date as the later of: (a) the General Bar Date, or (b) 20 days after the amendment to the Schedules is served on the claimant. The Plan does not extend any of the Bar Dates established in the Bar Date Order.

### E. Causes of Action Arising Under Chapter 5 of the Bankruptcy Code

On November 12, 2010, the court entered the Order Granting Motion of Official Committee of Unsecured Creditors for Derivative Standing to Permit Committee to Prosecute Chapter 5 Causes of Action on Behalf of the Debtors' Estates (the "Derivative Standing Order") (Docket No. 1071), pursuant to which the Creditors' Committee was granted standing to pursue all Causes of Action under Bankruptcy Code sections 510, 543, 544, 545, 547, 548, 549, 550, 551 and 553(b), and applicable state law (collectively, "Avoidance Actions"), all on behalf of the Debtors' Estates.

In accordance with the Derivative Standing Order, the Creditors' Committee investigated potential Avoidance Actions. In December of 2010, the Creditors' Committee initiated numerous Avoidance Actions by the filing of adversary proceedings in the Bankruptcy Court. The Plan provides for the transfer of the Avoidance Actions to the Liquidating Trust and the Debtors and the Liquidating Trustee hereby reserve any and all rights that each may have to file Avoidance Actions against any recipients or other beneficiaries of the transfers being investigated.

### F. Other Causes of Action of the Debtors

As noted above, the Creditors' Committee is investigating and prosecuting Causes of Action against third parties at this time. The Plan provides for the transfer of the Causes of Action to the Liquidating Trust and expressly preserves the Liquidating Trustee's right to bring all Causes of Action on behalf of the Debtors and their estates.

### G. Leases and Executory Contracts

The Debtors assumed and assigned certain Executory Contracts in connection with the sale of substantially all of their assets discussed in subsection J below. The Debtors also sought four orders authorizing rejection of certain Executory Contracts pursuant to section 365(a) of the Bankruptcy Code. The Bankruptcy Court entered the following rejection orders:

- Order Authorizing Debtors to Reject Executory Contracts and Unexpired Leases *Nunc Pro Tunc* to December 31, 2008, entered January 15, 2009 (Docket No. 155),

- Order Authorizing Debtors to Reject Unexpired Leases of Non-Residential Real Property, *Nunc Pro Tunc* To March 26, 2009 entered March 31, 2009 (Docket No. 449),

- Order Authorizing Debtors to Reject Unexpired Lease of Non-Residential Real Property, Effective June 30, 2009, entered June 29, 2009 (Docket No. 608),

- Order Authorizing Debtors to Reject Executory Contracts and Unexpired Leases *Nunc Pro Tunc* to April 10, 2009, entered August 12, 2009 (Docket No. 659).

-18-

The Plan provides for the rejection, pursuant to sections 365 and 1123 of the Bankruptcy Code, of each Executory Contract entered into by the Debtors prior to the Petition Date that has not expired or terminated pursuant to its own terms, been assumed, assumed and assigned, or rejected by an order of the Bankruptcy Court, or been designated as an Assumed Executory Contract in the Plan.

### H. Sale of Substantially All of the Debtors' Assets

On March 13, 2009 the Bankruptcy Court entered the Order Approving Motion of Debtors for Entry of an Order (A) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (B) Approving the Debtors' Proposed Sale of Substantially All of their Assets (Docket No. 391) (the "Sale Order"). The sale closed on March 26, 2009 (the "Sale Closing Date"). Pursuant to the Sale Order, the Debtors assumed and assigned certain Executory Contracts to Cerion, LLC (the "Purchaser") and sold substantially all of their assets to the Purchaser.

Pursuant to the Sale Order, the Debtors received net proceeds of approximately $16,031,508.00 (the "Sale Proceeds") after an agreed upon working capital adjustment. The Sale Order distributed the Sale Proceeds as follows: (a) $9,818,669.05, less the working capital adjustment of $137,161.01, was transferred to the Prepetition Lenders for provisional application to the prepetition obligations, (b) $1,900,000.00 was held by the Debtors in escrow pending the outcome of the Committee Challenge (defined below), (c) $2,500,000.00 was deposited into a segregated professional fee carve out account, and (d) $1,950,000.00 was deposited in the Debtors' disbursement account for the purpose of funding the Debtors' operating expenses through the Sale Closing Date.

### I. The Lender Settlement Agreement

On May 15, 2009, the Creditors' Committee filed an adversary complaint against the Prepetition Lenders challenging the extent, priority and validity of the Prepetition Lenders' liens in the Sale Proceeds and other funds held by the Debtors (the "Committee Challenge"). On October 2, 2009, the Bankruptcy Court entered an Order (the "9019 Order") Approving Settlement by and among Debtors, GECC, as Prepetition Agent and DIP Agent, the Consenting Prepetition Lenders[3] and the Creditors' Committee (the "Settlement Agreement").

The Settlement Agreement authorized the Consenting Prepetition Lenders to retain and apply to their secured claims (i) certain cash and collateral received from the Debtors prior to the Settlement Agreement, (ii) approximately $1,325,000.00 of the $1,900,000.00 of the Sale Proceeds held in escrow by the Debtors and (iii) up to $406,521.30 held in the Debtors' prepetition escrow account. The Settlement Agreement transferred to the Debtors, for the benefit of their Creditors, (i) up to $575,000 of the Sale Proceeds held in escrow by the Debtors, (ii) all funds in the Debtors' disbursement account (approximately $74,644.11 as of August 21, 2009),

---

[3] The Settlement Agreement provided a mechanism for Prepetition Lenders to opt out of the terms of the Settlement Agreement and continue to defend the Committee Challenge. None of the Prepetition Lenders opted out of the Settlement Agreement, thus, the Prepetition Lenders and the Consenting Prepetition Lenders are identical.

#11822429 v9

(iii) the balance, if any, in the Debtors' Professional Fee Carve-Out Account (as defined in the 9019 Order) to the extent not used to pay professional fees and 28 U.S.C. §1930 fees, and (iv) GECC and the Consenting Prepetition Lenders' liens and security interests in assets other than the Consenting Prepetition Lender Distributions (as defined in the Settlement Agreement). The Settlement Agreement also provided for the subordination of Lender Deficiency Claims held by the Consenting Prepetition Lenders to all other unsecured and undersecured claims.

### J.    Disposition of Other Assets

On December 29, 2009, the Bankruptcy Court entered an Order Authorizing Sub 1A to Release Mortgage Liens on 2040 and 2111 (collectively, the "Mortgaged Properties") W. Thompson Road, Fenton Michigan (the "Mortgage Release Order") (Docket No. 828). The Mortgage Release Order authorized the Debtors to release their mortgage liens on the Mortgaged Properties in exchange for the net proceeds of the sales of the Mortgaged Properties. The Debtors received approximately $129,000 in net proceeds from the sale of the Mortgaged Properties.

## VIII.  SUMMARY OF THE PLAN.

### A.    General

SET FORTH IN THIS ARTICLE IS A SUMMARY OF CERTAIN OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONFIRMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND CAREFUL READING OF THE PLAN, A COPY OF WHICH IS ANNEXED HERETO AS **EXHIBIT A**. STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTORS BASED ON CURRENT INFORMATION AND ARE NOT A REPRESENTATION AS TO THE ACCURACY OF THESE AMOUNTS. FOR AN EXPLANATION OF THE BASIS FOR, LIMITATIONS OF, AND UNCERTAINTIES RELATING TO, THESE CALCULATIONS, SEE THE SECTION ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," BELOW.

### B.    Plan Overview

As described above, the principal goal of a Chapter 11 bankruptcy case is to reorganize or liquidate a debtor's business for the benefit of itself and its creditors and interest holders. The plan of reorganization or liquidation is the blueprint by which these goals are accomplished. It provides the rules and procedures pursuant to which a debtor's creditors and interest holders may be paid and lists the steps a debtor will take to either reorganize or wind up its business.

The Plan provides for the liquidation and conversion of all of the Debtors' Assets to Cash, or the abandonment of Assets, as the case may be, and the distribution of the net proceeds therefrom to Creditors holding Allowed Claims, in accordance with the relative priorities set forth in the Bankruptcy Code. The Plan contemplates the establishment of a

Liquidating Trust and appointment of a Liquidating Trustee, among other things, to implement the terms of the Plan and make distributions in accordance therewith.

### C. Treatment of Claims and Interests

The Plan classifies Claims and Interests into 4 unclassified categories of Claims and 7 Classes and provides different treatment for the different unclassified categories of Claims, Classes of Claims and Interests. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class. A Claim is also placed in a particular category or Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class or category and such Claim has not been paid, released or otherwise settled prior to the Effective Date.

The following table sets forth a brief summary of the classification and general treatment of Claims and Interests under the Plan. In accordance with § 1123(a)(1) of the Bankruptcy Code, (i) Non-Professional Fee Administrative Claims, (ii) Professional Fee Claims, and (iii) Priority Tax Claims have not been classified and will be paid in full in Cash to the extent such Claims become Allowed Claims. Claims arising under Section 503(b)(9) of the Code have not been classified and will receive treatment in a manner negotiated among those members of the Creditors' Committee that do not hold 503(b)(9) Claims and those members of the Creditors' Committee that hold 503(b)(9) Claims. All other Claims and Interests have been classified.

The information set forth in the table is for convenience of reference only. Each Holder of a Claim or Interest should refer to Articles II, III, and IV of the Plan, and the liquidation analysis annexed as **Exhibit B** hereto (the "Liquidation Analysis"), for a full description of the classification and treatment of Claims and Interests provided under the Plan. ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED RECOVERIES ARE REASONABLE, NO REPRESENTATION CAN BE OR IS BEING MADE WITH RESPECT TO WHETHER THE ESTIMATED RECOVERIES SHOWN WILL BE REALIZED BY THE HOLDER OF AN ALLOWED CLAIM IN A PARTICULAR CLASS. THE ACTUAL RECOVERIES UNDER THE PLAN BY HOLDERS OF CLAIMS WILL DEPEND UPON A VARIETY OF FACTORS INCLUDING BUT NOT LIMITED TO WHETHER, AND IN WHAT AMOUNT, CONTINGENT CLAIMS AGAINST THE DEBTORS BECOME NON-CONTINGENT AND FIXED; WHETHER, AND TO WHAT EXTENT, DISPUTED CLAIMS ARE RESOLVED IN FAVOR OF THE DEBTORS; AND TO WHAT EXTENT RECOVERIES ARE OBTAINED FROM THE DEBTORS' TANGIBLE ASSETS AND CAUSES OF ACTION. FOR AN EXPLANATION OF THE BASIS FOR, LIMITATIONS OF, AND UNCERTAINTIES RELATING TO THESE CALCULATIONS SEE SECTION ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," BELOW.

| Class | Description of Claims or Interests | Status | Summary of Treatment Under the Plan |
|-------|-----------------------------------|--------|-------------------------------------|
|       |                                   |        |                                     |

#11822429 v9

| | | | |
|---|---|---|---|
| Unclassified | Non-Professional Fee Administrative Claims | Unimpaired | Other than 503(b)(9) Claims, 100% of the unpaid Allowed amount of Non-Professional Fee Administrative Claims will be paid in Cash on or as soon as reasonably practicable after the Effective Date or 30 days after the Administrative Claim becomes an Allowed Administrative Claim. |
| Unclassified | Professional Fee Claims | Unimpaired | 100% of the unpaid Allowed amount of Professional Fee Claims will be paid in Cash on the later of the Effective Date or the date of entry of an order allowing such Professional Fee Claims. |
| Unclassified | 503(b)(9) Claims | Impaired | Each Holder of an Allowed 503(b)(9) Claim shall receive on account thereof its pro rata share of: <br> (i) $225,000.00, on or as soon as reasonably practicable after the Effective Date; plus <br> (ii) (A) 60% of all Distributable Net Proceeds except for net proceeds of claims other than Avoidance Actions plus (B) 25% of net proceeds of claims other than Avoidance Actions, until all 503(b)(9) Claims are paid in full with interest from the Effective Date at the federal judgment rate in effect on the Effective Date. |
| Unclassified | Priority Tax Claims | Unimpaired | The Liquidating Trustee shall pay, at the Liquidating Trustee's discretion, (i) 100% of the unpaid Allowed amount of Priority Tax Claims in Cash on or as soon as reasonably practicable after the Effective Date or thirty days after the Priority Tax Claim becomes an Allowed Priority Tax Claim or; (ii) over a period ending not less than five years after the Petition Date, with deferred Cash payments equal in amounts on a quarterly basis in an aggregate amount equal to the Allowed Priority Tax Claim, together with interest thereon (if and so required) at the legal rate required for such Claim in chapter 11 cases. |
| Class 1 | Priority Unsecured Claims | Unimpaired | 100% of the unpaid Allowed amount of Priority Unsecured Claims will be paid in Cash on or as soon as reasonably practicable after the later of the Effective Date or the date such Priority Unsecured Claim becomes an Allowed Priority Unsecured Claim. |

#11822429 v9

| | | | |
|---|---|---|---|
| Class 2 | Other Secured Claims | Unimpaired | At the Liquidating Trustee's Option, (i) 100% of the unpaid amount of Allowed Other Secured Claims, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, will be paid in Cash on or as soon as reasonably practicable on the later of the Effective Date and the date that such Other Secured Claim becomes an Allowed Other Secured Claim, or (ii) the Collateral securing the Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on or as soon as reasonably practicable after the Effective Date or the date such Other Secured Claim becomes an Allowed Other Secured Claim. |
| Class 3 | Convenience Claims | Impaired – Entitled to Vote | Except to the extent that a Holder of an Allowed Convenience Claim has been paid prior to the Effective Date, each Holder of an Allowed Convenience Claim shall receive, in full and complete settlement, satisfaction and discharge of such Allowed Claim, as soon as reasonably practicable following the later of the Effective Date or the date on which a Convenience Claim becomes an Allowed Claim, Cash in an amount equal to three and one-half percent (3.5%) of such Allowed Convenience Claim, without Postpetition Interest. |
| Class 4 | General Unsecured Claims | Impaired – Entitled to Vote | Except to the extent that a Holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, in full and complete settlement, satisfaction and discharge of such Allowed Claim, and after payment in full of all Allowed A/P Claims, Allowed Professional Fee Claims and Allowed Convenience Claims, its pro rata share of: (a) $150,000.00, which shall be funded into the General Unsecured Reserve Account on the Effective Date; plus (b) (A) 40% of Distributable Net Proceeds except for net proceeds of claims other than Avoidance Actions plus (B) 75% of net proceeds of claims other than Avoidance Actions, until all 503(b)(9) Claims are paid in full with interest from the Effective Date at the federal judgment rate in effect on the Effective Date; plus (c) any Distributable Net Proceeds remaining after all 503(b)(9) Claims have been paid in full with interest from the Effective Date at the federal judgment rate in effect on the Effective Date. |

#11822429 v9

| Class 5 | Lender Deficiency Claims | Impaired – Entitled To Vote | Lender Deficiency Claims will receive Cash in an amount equal to the Holder's Pro Rata share of the remaining funds in the Liquidating Trust after Claims in Class 1 through Class 4 and expenses of the Liquidating Trust have been paid in full. |
| Class 6 | Intercompany Claims | Impaired- Deemed to Reject | The Holders of Intercompany Claims shall not receive any distributions on account of the Intercompany Claims and, on the Effective Date, all Intercompany Claims shall be extinguished. |
| Class 7 | Interests | Impaired – Deemed to Reject | The Holders of Interests shall not receive any distributions on account of the Interests and, on the Effective Date, all Interests shall be extinguished. |

### D.     Anticipated Distributions

Under the Plan, Holders of Allowed:  (i) Non Professional Fee Administrative Claims, (ii) Professional Fee Claims, (iii) Priority Tax Claims, (iv) Priority Unsecured Claims, and (v) Other Secured Claims will receive 100% distribution on account of their Claims.

As reflected on the Liquidation Analysis attached hereto as **Exhibit B**, the Proponents anticipate that $150,000 will be available as of the Effective Date to reserve for distribution to Holders of Allowed General Unsecured Claims.  The Proponents estimate that the total amount of Class 4 General Unsecured Claims is approximately $103,140,000.  Accordingly, the Proponents estimate that Holders of Allowed General Unsecured Claims will receive a minimum Pro Rata distribution equal to approximately 0.15% of their Allowed Claims.  The bulk of anticipated distribution to Class 4 will come from recoveries in Avoidance Actions and other litigation.  The actual distribution may prove higher or lower than this estimate, depending on, among other things, the actual amount of Cash available for distribution, the universe of General Unsecured Claims after the Claims reconciliation process has been completed, and recoveries from litigation.

The Plan provides that Holders of Allowed Convenience Claims will receive Cash in an amount equal to three and one-half percent (3.5%) of such Allowed Convenience Claim, without interest on or as soon as reasonably practicable following the Effective Date.  The Proponents estimate that the total amount of Convenience Claims is approximately $525,000 and that the Convenience Claims represent approximately half in number of all unsecured claims in these cases.

Because the value of the Debtors' Assets is believed to be less than the total value of their debts and liabilities, it is not anticipated that the Holders of (i) Lender Deficiency Claims, (ii) Intercompany Claims and (iii) Interests will receive any distribution on account of their Claims.

-24-

E. **Treatment of Executory Contracts and Unexpired Leases**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, except as provided for in the Plan, Confirmation Order, or an Order of the Bankruptcy Court, discussed more fully in Section VII.I above, all Executory Contracts that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors on the Confirmation Date and effective as of: (1) the Confirmation Date, or (2) if an Executory Contract has been removed from the Assumed Contract List after the Confirmation Date, as of the date of such removal.

Proofs of Claim for damages arising out of the rejection of an Executory Contract under the Plan must be filed with Kurtzman Carson Consultants, LLC, 2335 Alaska Ave. El Sequndo, CA 90245 (Telephone (310) 776-7316) and a copy served on counsel for the Plan Proponents and the Liquidating Trustee at the following addresses: (i) Pepper Hamilton LLP, Attn: Robert S. Hertzberg, 100 Renaissance Center, Suite 3600, Detroit MI 48243; (ii) Pepper Hamilton LLP, Attn: David M. Fournier, 1313 Market Street, Suite 5100, P.O. Box 1709, Wilmington, DE 19899-1709; and (iii) Stevens & Lee, P.C., Attn: Joseph H. Huston, Jr., 1105 N. Market Street, Seventh Floor, Wilmington, DE 19801 within thirty (30) days after the Confirmation Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Liquidating Trust, the Liquidating Trustee, their successors, their assigns, or the Assets.

F. **Means for Implementing the Plan**

1. *Substantive Consolidation*

From and after the Effective Date, the Subsidiary Debtors will be Substantively Consolidated with and into PPI Holdings, Inc. Accordingly, (a) on and after the Effective Date: each and every Claim filed or to be filed in the chapter 11 cases of the Subsidiary Debtors (other than a Claim of another Debtor) shall be treated as filed against only the PPI Holdings, Inc. Estate and shall constitute one Claim in these cases; and (b) for all purposes associated with confirmation, including, without limitation, for purposes of tallying acceptances and rejections of the Plan, the Estates of the Debtors shall be treated as one consolidated Estate.

2. *Formation of Liquidating Trust*

The Plan provides for the formation of a Liquidating Trust and appointment of a Liquidating Trustee. The Liquidating Trust shall be established for the sole purpose of liquidating and distributing the Liquidating Trust Assets. The Liquidating Trustee will be identified in the Plan Supplement filed with the Bankruptcy Court and will be approved by the Bankruptcy Court in the Confirmation Order.

3. *Conveyance of Liquidating Trust Assets*

On the Effective Date, the Debtors' (i) Assets, (ii) Cash and (iii) Causes of Action not otherwise disposed of in the Plan shall vest in the Liquidating Trust. As set forth above, the Liquidating Trust and the Liquidating Trustee shall liquidate and distribute the proceeds of the Liquidating Trust Assets to the Holders of the Classes identified in the Plan.

-25-

The Liquidation Analysis attached hereto as **Exhibit B** sets forth a summary of the sources of estimated proceeds and an estimate of proceeds that may be available for distribution on account of Allowed Claims. THE AMOUNTS CONTAINED IN THE LIQUIDATION ANALYSIS REPRESENT ESTIMATES BY THE PROPONENTS, BASED ON CURRENT INFORMATION ONLY AT THE TIME THIS DISCLOSURE STATEMENT WAS PREPARED. The value of Assets available to carry out the Plan and for distribution to Holders of Allowed Claims is subject to significant estimation assumptions. The cash on hand as of the Effective Date depends on factors that may include, but are not limited to, the actual costs of administering the Debtors' Estates during the period up to the Effective Date. THE PROPONENTS MAKE NO REPRESENTATION AS TO THE AMOUNT OF CASH THAT WILL ULTIMATELY BE AVAILABLE FOR DISTRIBUTION TO CREDITORS.

4. *The Liquidating Trustee*

The Liquidating Trustee shall be vested with the rights, powers and benefits set forth in the Liquidating Trust Agreement. The Liquidating Trustee shall, in its reasonable business judgment and in an expeditious but orderly manner, liquidate and convert the Liquidating Trust Assets to Cash, make timely distributions, and not unduly prolong the duration of the Liquidating Trust. The liquidation of the Liquidating Trust Assets may be accomplished either through the sale of Liquidating Trust Assets (in whole or in combination), or through prosecution or settlement of the Causes of Action, or otherwise.

The Plan and the Liquidating Trust Agreement expressly authorize the Liquidating Trustee to do the following, by way of illustration and not of limitation:

a. file, prosecute, collect, compromise and settle any Causes of Action;

b. subject to the approval rights of the Oversight Committee, sell, abandon, exchange or otherwise dispose of the Liquidating Trust Assets;

c. file, prosecute, compromise and settle objections to Claims;

d. open and maintain bank accounts in the name of the Liquidating Trust, draw checks and drafts thereon on the sole signature of the Liquidating Trustee, and terminate such accounts as the Liquidating Trustee deems appropriate;

e. execute any documents and pleadings, and take any other actions related to, or in connection with, the liquidation of the Liquidating Trust Assets and the exercise of the Liquidating Trustee's powers granted in the Plan and the Liquidating Trust Agreement, including the exercise of the Debtors' or the Creditors' Committee's respective rights to conduct discovery and oral examination of any party under Bankruptcy Rule 2004;

f.     hold legal title to any and all rights of the Beneficiaries in or arising from the Liquidating Trust Assets, including the right to vote any claim or interest in an unrelated case under the Bankruptcy Code and receive any distribution thereon;

g.     protect and enforce the rights to the Liquidating Trust Assets vested in the Liquidating Trust by the Plan by any method deemed appropriate including by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

h.     deliver distributions as may be authorized by the Plan;

i.     forward to the Debtors' respective assigns all trailing documents (i.e., recorded mortgages and title policies) and all other loan related notices, including tax notices, insurance notices, litigation notices and related documents;

j.     file, if necessary, any and all tax returns with respect to both the Debtors and the Liquidating Trust, pay taxes, if any, properly payable by the Liquidating Trust, and make distributions to the Beneficiaries;

k.     make all necessary filings in accordance with any applicable law, statute or regulation;

l.     determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

m.     invest funds received by the Liquidating Trust or otherwise held by the Liquidating Trust in accordance with the Plan;

n.     in the event that the Liquidating Trustee determines that the Beneficiaries or the Liquidating Trust may, will or have become subject to adverse tax consequences, take such actions that will, or are intended to, alleviate such adverse tax consequences; and

o.     utilize the Liquidating Trust Assets to purchase or create and carry all appropriate insurance policies and pay all insurance premiums and costs necessary or advisable to insure the acts and omissions of the Liquidating Trustee and the Oversight Committee and its members, and to maintain all other insurance policies in a manner that protects the Beneficiaries as appropriate under the Plan.

## G.    Effect of Confirmation and Injunction

1.     *Injunction.*

#11822429 v9

*Except as otherwise expressly provided in the Plan or in the Confirmation Order or the documents executed pursuant to the Plan or the Confirmation Order, on and after the Effective Date, all Persons and entities who have held, currently hold, or may hold Claims against or Interests in the Debtors or the Estates that arose before the Effective Date (including states and other federal or state governmental units or offices, and any federal or state official, employee, or other entity acting in an individual or official capacity on behalf of any state, federal or other governmental units or offices) are permanently enjoined, with respect to such Claims or Interests, from: (i) commencing or continuing in any manner, directly or indirectly, any action or other proceeding against any Protected Party or any property of any Protected Party; (ii) enforcing, attaching, executing, collecting, or recovering in any manner, directly or indirectly, any judgment, award, decree, or order against any Protected Party or any property of any Protected Party; (iii) creating, perfecting, or enforcing, directly or indirectly, any lien or encumbrance of any kind against any Protected Party or any property of any Protected Party; (iv) asserting or effecting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due to any Protected Party or any property of any Protected Party; and (v) any act, in any manner, in any place whatsoever, that does not conform to or comply with, or is inconsistent with any provisions of the Plan or the Confirmation Order. Any Person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator. Nothing contained in the Injunction or in the Confirmation Order shall prohibit the Holder of a Disputed Claim from litigating its right to seek to have the Disputed Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of a Disputed Claim of any of the obligations of the Debtors, the Liquidating Trustee, or the Liquidating Trust under the Plan.*

2. *Injunction Against Interference With Plan.*

*Upon the entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, including the Debtors, along with the respective present and former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.*

3. *Term of Injunctions.*

*Unless otherwise stated in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases by orders of the Bankruptcy Court, under sections 105 or 362 of the Bankruptcy Code, the Plan, or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect as to the Debtors and the Estates, and shall apply to the Liquidating Trust and the Liquidating Trustee, in each instance to the same extent applied to the Debtors and the Estates, and until the later of: (i) entry of the Final Decree; or (ii) the dissolution of the Liquidating Trust.*

4. *Exculpation.*

*On and after the Effective Date, none of the Exculpated Parties shall have or incur any liability for, and each Exculpated Party is hereby released from, any claim, cause of*

-28-

*action or liability to any other Exculpated Party, to any Holder of a Claim or Interest, or to any other party in interest, solely for any act or omission that occurred during the Chapter 11 Cases or in connection with the preparation, filing, or administration of the Chapter 11 Cases, the post-petition formulation, negotiation, or pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for claims, causes of action, or liabilities arising from the gross negligence, willful misconduct or fraud of any Exculpated Party, in each case subject to a determination by Final Order of a court of competent jurisdiction and provided that any Exculpated Party shall be entitled to rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Moreover, Exculpated Parties who do not have a role in these Chapter 11 Cases after the Effective Date (i.e., Exculpated Parties who do not have a role in the Liquidating Trust or the Oversight Committee) shall not have any liability in connection with actions or omissions by the Liquidating Trustee, the Oversight Committee or their respective employees, members, designees, professionals, agents or representatives. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.*

5. *Binding Effect of Plan.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates and their respective successors or assigns, whether or not the Claim or Interest of such Holder is Impaired under the Plan, whether or not the Holder has accepted the Plan and whether or not the Holder has filed a Proof of Claim. The rights, benefits and obligations of any Person named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of that Person (including any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

6. *Retention of Causes of Action/Reservation of Rights.*

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan or otherwise in the Chapter 11 Cases, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trustee shall be vested with, retain, and may exclusively enforce and prosecute all claims or Causes of Action that the Debtors, the Estates or the Liquidating Trust may have against any Person. The Liquidating Trustee may pursue any claims or Causes of Action in accordance with the best interests of the Creditors of the Debtors, the Estates, or the Liquidating Trust in any and all appropriate jurisdictions as the Liquidating Trustee shall deem advisable.

## H.   Post-Confirmation Jurisdiction of the Bankruptcy Court

After confirmation of the Plan, the Bankruptcy Court retains jurisdiction to oversee various aspects of the administration of the Debtors' Estates, the Liquidating Trust and the Liquidating Trustee, as enumerated in the Plan.

# IX. CONFIRMATION OF THE PLAN.

## A. Introduction

The Bankruptcy Code requires the Bankruptcy Court to determine whether a plan of reorganization complies with the technical requirements of chapter 11 of the Bankruptcy Code. It requires further that a plan proponent's disclosures concerning such plan be adequate and include information concerning all payments made or promised by the debtor in connection with the plan.

To confirm the Plan, the Bankruptcy Court must find that all of these, and certain other requirements, have been met. Thus, even if the requisite vote is achieved for each Class of Impaired Claims, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan. Some of these statutory requirements are discussed below.

## B. Conditions to Confirmation and Effective Date

The Plan may not be confirmed unless the Disclosure Statement has been approved by the Bankruptcy Court and all other requirements for confirmation under the Bankruptcy Code have been met.

The Effective Date may not occur, and thus the Plan will not become effective, unless: (a) the Bankruptcy Court shall have approved the Disclosure Statement, (b) the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance reasonably satisfactory to the Plan Proponents; (c) no stay of the Confirmation Order shall then be in effect; (d) the Liquidating Trust shall have been formed, (e) the Liquidating Trustee shall have been appointed and approved by the Bankruptcy Court; (f) all Carve-Outs and Reserve Accounts shall have been fully funded, in the amounts required by the Plan to be funded on the Effective Date, into accounts established by the Liquidating Trustee; and (e) all parties entitled to receive notice of the assumption or rejection of Executory Contracts shall have received such notice and no objections to the assumption of the Assumed Executory Contracts (if any) shall remain unresolved.

## C. Voting Procedures and Standards

Only Holders of Claims that are not the subject of a pending objection, have not been disallowed or estimated at $0 for voting purposes by the Bankruptcy Court, are "impaired" under the Plan, and are not deemed to reject the Plan by virtue of receiving no distributions thereunder will receive a Ballot with this Disclosure Statement for the acceptance or rejection of the Plan. Only Holders of Class 3 – Convenience Claims, Class 4 – General Unsecured Claims and Class 5 – Subordinated Lender Claims are entitled to vote. Holders of Claims or Interests whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code are considered "impaired."

Instructions on how to complete a Ballot and the deadline for voting on the Plan are contained in the solicitation materials accompanying this Disclosure Statement and the Plan.

#11822429 v9

IF A BALLOT IS DAMAGED OR LOST OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT:

> John H. Schanne, II, Esq.
> Pepper Hamilton LLP
> Hercules Plaza, Suite 5100
> 1313 N. Market Street
> P.O. Box 1709
> Wilmington, DE 19899
> Telephone: 302.777.6500
> Facsimile: 302.421.8390

A VOTE MAY BE DISREGARDED IF THE BANKRUPTCY COURT DETERMINES, AFTER NOTICE AND A HEARING, THAT SUCH ACCEPTANCE OR REJECTION WAS NOT MADE OR SOLICITED OR PROCURED IN GOOD FAITH OR IN ACCORDANCE WITH THE PROVISIONS OF THE BANKRUPTCY CODE.

Any Impaired Class of Claims that fails to achieve the requisite "accepted" vote will be deemed to have rejected the Plan.

### D. <u>Acceptance</u>

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote. Acceptance of the Plan need only be solicited from non-administrative claim creditors who are Holders of Claims allowable under section 502 of the Bankruptcy Code whose Claims are "impaired" and not deemed to have rejected the Plan. Except in the context of a "cramdown" (i.e., confirmation of a plan that has not been accepted by all impaired classes), as a condition to confirmation of the Plan, the Bankruptcy Code requires that, with certain exceptions, each Class of Impaired Claims accepts the Plan.

The Plan is predicated on one or more of Class 3 – Convenience Claims, Class 4 – General Unsecured Claims and Class 5 – Subordinated Lender Claims voting to accept the Plan and on Holders of Claims under section 503(b)(9) agreeing to accept less than 100% of their claims on the Effective Date and payment of the pro rata shares of Distributable Proceeds pursuant to the formula describe above until such time, if ever, as their claims are paid in full. In the event the requisite votes are not obtained, the Proponents have the right, assuming that at least one class of Impaired Claims has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or impaired interests if the court finds that the plan does not discriminate unfairly and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cramdown."

If any of Class 3 – Convenience Claims, Class 4 – General Unsecured Claims or Class 5 – Subordinated Lender Claims votes to reject the Plan, the Proponents may seek a

cramdown of such Classes at the Confirmation Hearing. The Proponents will, in any event, seek a cramdown of the Plan on Classes deemed to reject the Plan by virtue of receiving no distributions thereunder.

## E. Confirmation and Consummation

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The Proponents of the plan have complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponents under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

- The Proponents have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office of such individual, must be consistent with the interests of creditors and equity security holders and with public policy and the proponents must have disclosed the identity of any insider that the reorganized debtors will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims or interests entitled to vote has either accepted the plan or is not impaired under the plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of

such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan (unless, as here, such liquidation is proposed in the plan).

Subject to receiving the requisite votes in accordance with § 1129(a)(8) of the Bankruptcy Code and the "cramdown" of Classes not receiving any distribution under the Plan, and absent objection to the Plan by the Holder of an Allowed 503(b)(9) Claim, the Debtors believe that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtors have complied, or will have complied, with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

1.    *Best Interests of Holders of Claims and Interests*

The "best interests of creditors" test requires that the court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim or interest of each impaired class of claims or interests will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date. The Liquidation Analysis annexed as **Exhibit B** hereto demonstrates that the Proponents have satisfied the "best interests of creditors" test.

To calculate what Holders of Claims would receive if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund") of the Debtors.  The Chapter 7 Liquidation Fund would consist of the net proceeds from the disposition of the Debtors' Assets (after satisfaction of all valid liens) augmented by the Cash held by the Debtors and recoveries on Causes of Action against third parties, if any.  The Chapter 7 Liquidation Fund would then be reduced by the costs of the liquidation.  The costs of liquidation under Chapter 7 would include the fees and expenses of a trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, any unpaid expenses incurred by the Proponents during the Chapter 11 Cases (such as fees for attorneys and financial advisors) which would be allowed in the Chapter 7 proceedings, and claims incurred by the Debtors during the pendency of the Chapter 11 Cases. These claims would be paid in full out of the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund, if any, would be made available to Holders of unsecured Claims.  In addition, other claims which would arise upon or following conversion to a Chapter 7

-33-

case would dilute the balance of the Chapter 7 Liquidation Fund available to Holders of Claims. Moreover, additional claims against the Debtors' Estates might arise as the result of the establishment of a new bar date for the filing of claims in the Chapter 7 cases for the Debtors. The present value of the distributions out of the Chapter 7 Liquidation Fund (after deducting the amounts described above) are then compared with the present value of the property offered to each Class of Claims and Holders of Interests under the Plan to determine if the Plan is in the best interests of each Holder of a Claim.

**The Proponents believe that a chapter 7 liquidation of the Debtors' Assets would result in diminution in the value to be realized under the Plan by Holders of Claims. That belief is based upon, among other factors: (a) the additional administrative expenses involved in the appointment of a trustee, attorneys, accountants, and other chapter 7 professionals; (b) the time which would elapse before Creditors would receive any distribution in respect of their Claims due to a trustee's need to become familiar with the Chapter 11 Cases and the Debtors' books and records, and the trustee's duty to conduct independent investigations; and (c) the additional Claims that may be asserted against the Debtors in a chapter 7 case.**

2.    *Financial Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors unless such liquidation or reorganization is proposed in the plan. The Plan is a liquidating plan. Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

3.    *Acceptance by Impaired Classes*

A class is "impaired" under a plan unless, with respect to each claim or interest in such class, the plan: (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim or interest. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. See Section VIII, above, for identification of whether a Class is deemed impaired or unimpaired under the Plan.

4.    *Cramdown*

THE PROPONENTS RESERVE THE RIGHT TO SEEK TO IMPOSE THE PLAN UPON ANY NON-ACCEPTING CLASS(ES) OF HOLDERS OF CLAIMS OR INTERESTS UNDER THE "CRAMDOWN" PROVISIONS OF THE BANKRUPTCY CODE.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has

accepted the Plan. The "cramdown" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the cramdown provisions, upon the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting impaired class, (ii) the plan is fair and equitable with respect to each non-accepting impaired class, and (iii) at least one impaired class has accepted the plan. These standards ensure that holders of junior interests, such as common stockholders, cannot retain any interest in the debtor under a plan that has been rejected by a senior class of impaired claims or interests unless such impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the Holders of each type of Claim and Interest and by treating each Holder of a Claim and Interest in each Class identically, the Proponents believe that they have structured the Plan so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before any junior class may receive anything under the plan. In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

With respect to a Class of Claims that does not accept the Plan, the Proponents must demonstrate to the Bankruptcy Court that either (i) each Holder of a Claim in the dissenting Class receives or retains under the Plan property of a value equal to the allowed amount of its Claim, or (ii) the Holders of Claims or Interests that are junior to the Claims of the Holders of such Claims or Interest will not receive or retain any property under the Plan. Additionally, the Proponents must demonstrate that the Holders of Claims that are senior to the Claims of the dissenting Class of Claims receive no more than payment in full on their Claims under the Plan. The Plan is designed to satisfy these standards. Holders of Lender Deficiency Claims, Intercompany Claims and Interests are not expected to receive any distributions on account thereof, and will only receive a distribution if and to the extent that claimants holding General Unsecured Claims are paid in full with postpetition interest.

If all the applicable requirements for confirmation of the Plan are met as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims or Interests fail to accept the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code, the Proponents will request that the Bankruptcy Court confirm the Plan over the dissenting votes of such Classes in accordance with section 1129(b) of the Bankruptcy Code. The Proponents believe that the Plan satisfies the cramdown requirements of the Bankruptcy Code. The Proponents may seek confirmation of the Plan over the objection of dissenting Classes, as well as over the objection of individual Holders of Claims or Interests who are

-35-

members of an accepting Class. In addition, the Proponents intend to seek cramdown of the Plan on Classes deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no distributions thereunder. There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

5.    *Classification of Claims and Interests*

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests which are "substantially similar."

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED.

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### A.    <u>Risk That Distributions Will Be Less Than Estimated by the Debtors</u>

The projected distributions and recoveries set forth in this Disclosure Statement are based on the Debtors' estimates of Allowed Claims. The Debtors project that the Claims asserted against the Debtors will be resolved in, and reduced to, amounts that approximate their estimates. However, there can be no assurance that the Debtors' estimates will prove accurate. Distributions to Creditors also will be affected by the amount of Cash the Debtors are able to realize from the liquidation of the Debtors' Assets and recoveries, if any, from the Causes of Action, as well as the costs of continuing to administer the Chapter 11 Cases and to pursue Causes of Action.

Additionally, certain of the administrative costs, such as the Liquidating Trustee's compensation and the non-Liquidating Trustee members on the Oversight Committee's compensation, are incurred on a periodic basis, such that administration costs are directly proportional to the duration of these Chapter 11 Cases.

The Debtors reserve the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any Creditor whose Claim is subject to a successful objection. Any such Creditor may not receive the estimated distributions set forth herein.

#11822429 v9

B.    **Litigation Risks**

The Debtors do not believe that there are any risks with respect to pending or threatened litigation against them that would significantly or materially negatively affect Creditors' recoveries under the Plan.

C.    **Bankruptcy Risks**

1.    *Objection to Classifications*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court would reach the same conclusion.

2.    *Risk of Non-Confirmation of the Plan*

Even if Class 3 – Convenience Claims, Class 4 – General Unsecured Claims and Class 5 – Lender Deficiency Claims vote to accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization unless, as here, such liquidation is proposed in the plan, and that the value of distributions to dissenting creditors and equity security holders not be less than the value of distributions such creditors and equity security holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

Additionally, except to the extent the Holder of an Allowed 503(b)(9) Claim agrees to different treatment, Section 1129 (a)(9) of the Bankruptcy Code would require that such Holder receive on the Effective Date, an account of such Claim, cash equal to the allowed amount of such Claim. The Proponents will request that the Bankruptcy Court deem any Holder of a 503(b)(9) Claim that does not timely object to confirmation of the Plan to have agreed to the treatment proposed for Allowed 503(b)(9) Claims under the Plan. Because such treatment was negotiated among Creditors' Committee members holding large 503(b)(9) Claims and Creditors' Committee members holding General Unsecured Claims but not 503(b)(9) Claims, and because the Proponents believe that the Plan will optimize recoveries by Holders of Allowed 503(b)(9) Claims, the Proponents believe that it is in the best interest of such Holders to consent to such treatment by refraining from objecting to the Plan. There can be no assurance, however, that all Holders of 503(b)(9) Claims will so consent. The Proponents believe that the Plan satisfies all the requirements for confirmation of a liquidating plan of reorganization under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

XI.    **STATEMENT CONCERNING INCOME TAX CONSEQUENCES.**

Confirmation of a plan of liquidation can have a number of tax implications upon the Holders of Claims and Interests against the Debtors, including, but not limited to,

discharge/cancellation of indebtedness and capital gains/losses. Given the relative size of the Debtors' Estates and the diverse nature of the Holders of Claims and Interests, the Debtors have not undertaken an analysis of the tax consequences of the Plan upon Holders of Claims and Interests. Accordingly, Creditors and parties in interest should consult competent tax counsel and other professionals for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS OR INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN MAY BE UNCERTAIN DUE TO, IN SOME CASES, THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE INTERNAL REVENUE SERVICE WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE UPHELD. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, OR OTHER TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE:** **To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this document is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any transaction or matter that is contained in this document.**

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions to Holders of Allowed Claims. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes, and the Debtors and Liquidating Trustee shall be authorized to withhold distribution on account of such Claims until the requisite information is received.

If any Allowed Claim Holder's distribution is returned as undeliverable, the Liquidating Trustee will take reasonable steps to attempt to deliver the distribution to the Holder of the Allowed Claim. Any Holder of an Allowed Claim that does not advise the Liquidating Trustee that it has not received its, his or her distribution within ninety (90) days after the date of attempted distribution will have its, his or her Claim for such undeliverable distribution discharged and will be forever barred from asserting any such Claim against the Debtors or their property. Distributions must be negotiated within ninety (90) days of the date of distribution. Any distributions which are undeliverable and unclaimed or have not been cashed within the

time periods set forth above shall become available for distribution to the Holders of Allowed Claims in accordance with the Plan and the Holder of an unclaimed or undeliverable distribution shall not be entitled to any further distribution under the Plan.

## XII.    ALTERNATIVES TO LIQUIDATING PLAN.

The Debtors ceased all business operations on or around March 26, 2009 in connection with the closing of the sale of substantially all of the Debtors' assets to the Purchaser pursuant to the Sale Order discussed in Section VII.H.    Accordingly, there is no viable alternative to the Plan that would include a continuation of the Debtors as ongoing businesses.

Since there is no alternative to liquidation, the Plan embodies what the Proponents consider to be the best and most cost-effective method of completing the orderly liquidation and distribution of the Assets to Creditors.  If the Plan is not confirmed, then these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.   In that event, the Proponents would cease their liquidation and distribution efforts and a trustee would be appointed to liquidate and eventually distribute the remaining Assets of the Estates.   The Proponents believe that a liquidation under chapter 7 would likely result in a lower return to Creditors, for the reasons described above, and that the timing of any distributions would be substantially delayed.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

#11822429 v9

## XIII.  CONCLUSION.

The Proponents believe that confirmation and implementation of the Plan will provide each Creditor with the same or a greater recovery than he, she or it would receive if the Debtors were to liquidate and distribute their Assets under chapter 7.  Thus, the Proponents recommend confirmation and implementation of the Plan as the best possible outcome for Creditors.  The Proponents therefore urge Holders of Impaired Claims that are entitled to vote to cast their Ballots in favor of the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Voting Agent on or before the Voting Deadline.

Dated: _____, 2011

PPI Holdings, Inc.
International Fineblanking Corporation
PPI Sub 1, Inc.
PPI Sub 1A, Inc.
Michigan Fineblanking, Inc.
PPI Sub-Holdings, Inc.
Precision Parts International Services Corp.
PPI Sub 2, Inc.
PPI Sub 2A, Inc.

By: _____
    Roger Goldbaum
    Chief Financial Officer

Official Committee of Unsecured Creditors of PPI Holdings, Inc., et al.

By: _____
    Name:
    Title: Committee Chair

#11822429 v9